STATE OF MINNESOTA

IN SUPREME COURT

A24-0694

Original Jurisdiction                                          Per Curiam
                                                    Took no part, Gaïtas, J.


Inquiry into the Conduct of the                      Filed: September 22, 2025
Honorable John P. Dehen.                             Office of Appellate Courts

_____

Eric J. Magnuson, Robins Kaplan LLP, Minneapolis, Minnesota, for the Board on Judicial Standards.

Susan M. Humiston, Director, Office of Lawyers Professional Responsibility, Saint Paul, Minnesota, for the Office of Lawyers Professional Responsibility.

Dan Rasmus, Hovland, Rasmus, & Brendtro, PLLC, Edina, Minnesota, for the Honorable John P. Dehen.

_____


S Y L L A B U S

1.      A judge does not commit misconduct by making findings of fact, reaching a legal conclusion, or applying the law as understood by the judge unless the judge acts contrary to clear and determined law and the error is egregious, made in bad faith, or made as part of a pattern or practice of legal error.

2.      A judge violates the Code of Judicial Conduct by improperly issuing two writs of mandamus compelling a district court administrator to increase the compensation for the judge's court reporter, despite having a conflict of interest, and without giving the district court administrator a meaningful opportunity to respond, when clear and

1

determined law proscribes such actions and the judge's contrary position therefore represents egregious error.

3. A judge does not violate Rule 2.3(A) of the Code of Judicial Conduct by making rulings in proceedings under Minnesota Statutes chapter 257D, even if those rulings are erroneous, when those rulings are neither foreclosed by clear and determined law nor the product of actual bias or prejudice.

4. A judge violates the Code of Judicial Conduct by conducting a remote calendar from a moving car in order to be able to travel to attend a family function.

5. Censure and suspension from judicial duties for nine months (or from the practice of law for a term equal to the balance of the judicial suspension if the judge ceases to be a judge before the term of judicial suspension ends) without pay is warranted for a judge who violated the Code of Judicial Conduct by improperly issuing two writs of mandamus compelling a district court administrator to increase the compensation for the judge's court reporter, despite having a conflict of interest, and without giving the district court administrator a meaningful opportunity to respond, and by improperly presiding over a remote court calendar while riding in a moving vehicle.

6. A public reprimand as an attorney is warranted for a judge who engaged in conduct prejudicial to the administration of justice by improperly issuing two writs of mandamus compelling a district court administrator to increase the compensation for the judge's court reporter, despite having a conflict of interest, and without giving the district court administrator a meaningful opportunity to respond, and by improperly presiding over a remote court calendar while riding in a moving vehicle.

# OPINION

PER CURIAM.

This proceeding arises from a formal complaint and an amended formal complaint filed by the Minnesota Board on Judicial Standards (the Board) against the Honorable John P. Dehen, Judge of District Court for the Tenth Judicial District, alleging violations of Minnesota's Code of Judicial Conduct. Judge Dehen filed a response denying the allegations of misconduct. We appointed a three-member panel (the panel) under Rules 8(b) and 10, Rules of Board on Judicial Standards (RBJS), to conduct a public hearing pursuant to Rule 8(b) on the charges contained in the formal complaint.

Following a two-day hearing, the panel made several findings. First, it found that Judge Dehen improperly issued two writs of mandamus compelling a district court administrator to increase his court reporter's compensation, despite Judge Dehen having a conflict of interest, and without giving the district court administrator a meaningful opportunity to respond. Second, the panel found that in five cases where Judge Dehen was requested to appoint guardians for at-risk juveniles under Minnesota Statutes section 257D.08 (2024), he failed to follow the statutory requirements and showed bias against non-citizen juveniles seeking special immigration status. Third, the panel found that Judge Dehen improperly presided over a remote juvenile court calendar while riding in a moving vehicle. The panel concluded that based on these three instances of misconduct, Judge Dehen violated Rules 1.1, 1.2, 2.1, 2.2, 2.3(A), 2.4, 2.5, 2.6(A), 2.8, and 2.11 of the Code of Judicial Conduct. The panel recommended that Judge Dehen be censured and suspended from judicial office without pay for six months.

3

Judge Dehen appealed the panel's findings, contending the Board failed to prove that he committed judicial misconduct by clear and convincing evidence. Judge Dehen also appealed the panel's recommended sanctions. We invited the Director of the Office of Lawyers Professional Responsibility (Director) to be heard on the issue of lawyer discipline under the Minnesota Rules of Professional Conduct.

We conclude that the Board has proven by clear and convincing evidence that Judge Dehen committed judicial misconduct in his actions with respect to the court reporter compensation dispute, in violation of Rules 1.1, 1.2, 2.2, 2.5, 2.6(A), and 2.11 of the Code of Judicial Conduct. And we conclude that the Board has likewise proven that Judge Dehen committed judicial misconduct in his actions with respect to the remote calendar, in violation of Rules 2.1, 2.4, and 2.8 of the Code of Judicial Conduct. But we conclude that the Board has not proven by clear and convincing evidence that Judge Dehen's actions with respect to the at-risk juvenile guardianship matters constitute a violation of the Code of Judicial Conduct, under the standards regarding judicial bias and legal error that we set forth today.

Because we conclude that Judge Dehen's judicial misconduct in the court reporter compensation dispute is particularly egregious, we further conclude that the appropriate judicial discipline for the proven misconduct is public censure and suspension from judicial duties for nine months without pay. Furthermore, in order to ensure that the sanction we impose will be effective, if Judge Dehen ceases to be a judge before his term of judicial suspension ends, then he will be suspended from the practice of law for a term equal to the balance of his judicial suspension. Finally, we conclude that Judge Dehen's actions that

violated the Code of Judicial Conduct constitute conduct prejudicial to the administration of justice, in violation of Minn. R. Prof. Conduct 8.4(d). But based on the judicial sanction given—which will carry over to a suspension from the practice of law in the event of Judge Dehen leaving the bench—and because the standard of conduct imposed on a judge is higher than the standard imposed on lawyers, we conclude that the appropriate lawyer discipline is a public reprimand.

## FACTS

### *Procedural Background*

Judge Dehen is a district court judge in the Tenth Judicial District. On April 26, 2024, the Board filed a formal complaint against Judge Dehen, alleging that he had violated the Code of Judicial Conduct by improperly issuing two writs of mandamus compelling a district court administrator to increase his court reporter's compensation. Judge Dehen filed a response denying misconduct. We appointed a three-member fact-finding panel to conduct a hearing on the Board's allegations. On July 1, 2024, the Board filed an amended formal complaint, adding allegations that in five cases where Judge Dehen was requested to appoint guardians for at-risk juveniles, he failed to follow the statutory requirements under Minnesota Statutes section 257D.08 (2024) and showed bias against non-citizen juveniles seeking special immigration status. The amended complaint also alleged that Judge Dehen improperly presided over a remote court calendar while in a moving vehicle. Judge Dehen filed a response, also denying the allegations of misconduct in the amended complaint.

5

A hearing was held before the three-member panel over two days in September 2024. The testimony at this hearing, as well as the exhibits admitted into evidence, establish the following facts.

### Background and Prior Misconduct

Judge Dehen was first licensed to practice law in Minnesota in 1988. He was elected to his position as a district court judge in the Tenth Judicial District in 2010, and he has served continuously in that role ever since. Judge Dehen is one of 16 district court judges currently chambered in Anoka County. We have previously disciplined Judge Dehen, both as a lawyer and as a judge. In 2006, we publicly reprimanded him as a lawyer and ordered him to pay $900 in costs and disbursements for failing to label solicitations as advertising material and conduct prejudicial to the administration of justice. *In re Dehen*, 721 N.W.2d 607 (Minn. 2006) (order). And in 2022, the Board privately admonished Judge Dehen for abusing the prestige of his judicial office and for improper demeanor when he was a plaintiff in a conciliation case.

### Facts Relating to Court Reporter Salary Dispute

Judge Dehen's court reporter, since 2017, has been L.S. Court reporters for the Minnesota Judicial Branch are members of a union, with salaries set by a collective bargaining agreement (agreement). At the relevant time, court reporters' salary scale had eleven "steps" with those at the top step (step 11) paid the most. Despite her training and experience, L.S.'s salary was at step 2, making her one of the lowest paid court reporters in the Judicial Branch. Judge Dehen believed that L.S. was underpaid.

6

L.S. learned from another court reporter in Anoka County that the other court reporter had been able to achieve an increase in salary by resigning and then being immediately rehired by that court reporter's judge at a higher step. There was no written Judicial Branch policy addressing a court reporter resigning their position and then being rehired simply to gain additional compensation. Under the agreement between the union and the Judicial Branch, a reporter rehired after a break in service of less than four years "at a minimum, shall be eligible for the salary earned at the time of separation." The "at a minimum" language, which was added for the 2020–21 agreement, was intended to allow for salary increases when a rehired court reporter had gained experience during their break in service.

When the other court reporter resigned, her judge had spoken with K.L., the Human Resources Manager for the Tenth Judicial District, about whether a court reporter could resign and then be rehired at a higher salary step. State court administration had told K.L. that the Judicial Branch "generally discourage[s]" the practice; from this, K.L. concluded that there was nothing she could do to stop the judge from rehiring the court reporter at a higher salary step, and district court administration did indeed subsequently allow that judge to rehire the court reporter at a step 11 salary in July 2023. In August 2023, Judicial Branch human resources clarified that the treatment of the other court reporter was contrary to the Judicial Branch's practices. But Judge Dehen was not immediately made aware of that clarification.

After consultation with Judge Dehen, who expressed his support for L.S. resigning and reapplying for the position, L.S. sent the district a letter of resignation effective

7

September 11, 2023.  Judge Dehen immediately posted the open court reporter position, with applications to close on September 13.  L.S. applied for the open position.  When the district received the application, K.L. told Judge Dehen that L.S. would have to be rehired at the same salary she was paid when she resigned or she would not be employed by the Judicial Branch.  Thereafter Sarah Lindahl-Pfieffer, the Tenth Judicial District Court Administrator, assumed responsibility for communicating with Judge Dehen regarding this issue.  On September 15, 2023, Lindahl-Pfeiffer sent Judge Dehen an email stating that it was not possible to hire L.S. at a higher rate of pay, stating that "[m]y hands are tied," and forwarding to Judge Dehen a copy of a 2022 union arbitration decision in which the arbitrator concluded that judges do not have authority under the CBA to set compensation for their court reporters.

Judge Dehen did not accept that response.  He communicated to Lindahl-Pfieffer his belief that he had authority to rehire L.S. and set her salary.  Then on September 20, 2023, Judge Dehen filed an order in Anoka County district court appointing L.S. as his court reporter.  He also signed and filed with the district court a peremptory writ of mandamus directing Lindahl-Pfieffer to immediately commence the employment of L.S. at a step 11 salary.  The Minnesota Office of Attorney General, acting on behalf of Lindahl-Pfieffer, promptly filed a motion in the district court to stay proceedings, and filed a petition for a writ of prohibition in the court of appeals.  The court of appeals immediately stayed the district court proceedings and directed Judge Dehen to file a response, noting that Judge Dehen was "the only party to the action."  Judge Dehen filed a response to the court of appeals on September 27, 2023, in which he identified himself as "the party

8

beneficially interested in the matter of the appointment of a court reporter," and argued that he has authority, under both Minn. Stat. § 486.01 (2024) and his "inherent power"—as well as support from our decision in *Clerk of Court's Compensation for Lyon County v. Lyon County Commissioners*, 241 N.W.2d 781, 784 (Minn. 1976)—to "appoint a competent court reporter" and set the salary for that court reporter.

The court of appeals disagreed with Judge Dehen and issued a writ of prohibition vacating his order and peremptory writ. *In re Lindahl-Pfieffer*, No. A23-1405, 2023 WL 7103265 (Minn. App. Oct. 24, 2023) (*"Lindahl-Pfieffer I"*). The court of appeals reasoned:

> The supreme court has held that judges lack inherent authority to set the salary of court employees by order when there is a statute on the subject and an established procedure to be followed. *Clerk of Ct's Compensation v. Lyon Cnty. Comm'rs.*, 241 N.W.2d 781, 787 (Minn. 1976). Similarly, in this case, there is a statute on court-reporter salaries [Minn. Stat. § 486.05, subd. 1 (2024)] and that statute incorporates personnel rules and policies and the collective bargaining agreement. None of these establish a clear duty to pay the judge's preferred court reporter at the top of the pay range. Accordingly, the order and writ setting the reporter's salary as an exercise of the court's inherent authority is unauthorized.
>
> The district judge also erred in issuing a peremptory writ. A peremptory writ is limited to rare cases in which the facts are so indisputable that the court can "take judicial notice" of them. *Home Ins. Co. v. Scheffer*, 12 Minn. 382, 383–84, 12 Gil. 261, 266 (1867); *see* Minn. Stat. § 586.04 (2022) (criteria for peremptory writ). Without indisputable proof being "furnished the court," without "any notice to the appellant of the application for the writ," and without the appellant admitting to "the facts set forth in the petition," it is improper for the court to assume them to be true and to deny the appellant "a right to be heard" and a "peremptory writ should not have been issued in the first instance." *Id.* at 385–86, 12 Gil. at 267. The judge in this case was aware that the court administrator disputed his right to rehire the court reporter at the top of the pay range, there was no notice to the court administrator or opportunity to be heard, and it is clear that a peremptory writ should not have been issued.

*Id.* at \*2. Although the Attorney General had argued on behalf of Lindahl-Pfieffer that if Judge Dehen was beneficially interested, it was improper for him "to also be the presiding judge," the court of appeals did not address questions of bias or conflict-of-interest—although it did observe that although "many of the additional arguments made by [Lindahl-Pfieffer] have merit, we need not address them, in light of our conclusion that no writ of mandamus should have been issued in this case." *Id.*

Notwithstanding the directive from the court of appeals in the writ of prohibition issued against Judge Dehen, he continued to disagree with Lindahl-Pfieffer about L.S.'s employment. Judge Dehen maintained that the court of appeals' writ of prohibition only prevented him from hiring L.S. at the top of the pay range and did not prohibit him from rehiring her at the mid-point salary for court reporters, whereas Lindahl-Pfieffer maintained that L.S. could only be paid the salary that she was earning when she resigned. On October 26, 2023, Judge Dehen informed Lindahl-Pfieffer that he was "going to immediately exercise [his] statutory discretion to appoint [L.S.] and hire her on at the midpoint of the range." And on October 31, 2023, Judge Dehen filed and served on Lindahl-Pfieffer, for a second time, a writ and related pleadings: an order and alternative writ of mandamus, directing her to respond to the writ of mandamus and appear at a hearing before Judge Dehen on November 2, 2023, and show cause for not hiring L.S. at a step 6, the midpoint salary for court reporters. Also included in the documents Judge Dehen filed and served was a nine-page, single-spaced "Information for Alternative Writ," setting forth "facts" that Judge Dehen presented and which "may be simultaneously considered as facts upon which [Judge Dehen] is taking judicial notice," and concluding with a "Demand" that

10

Lindahl-Pfieffer (1) "provide the Court with information regarding the review of the Court's Step 11 offer to [L.S.]," and (2) "onboard [L.S.] at the midpoint of the salary range, a Step 6, effective immediately." The pleadings were captioned in the same district court file as the previous writ.

The Attorney General again responded on behalf of Lindahl-Pfieffer. On November 1, 2023, the Attorney General filed a request to remove Judge Dehen from the case and also applied to the court of appeals for a second writ of prohibition. In the writ petition to the court of appeals, the Attorney General argued, among other things, that Judge Dehen exceeded his authority by improperly acting as the presiding judge when he was also a beneficially interested party, and that Judge Dehen's writ was "tantamount to a preemptory writ" because Judge Dehen ordered both immediate compliance *and* to show cause, denying Lindahl-Pfieffer a reasonable opportunity to be heard.

Meanwhile, court staff contacted Judge Dehen about assigning the case to a conflict judge, but Judge Dehen told the staff member that no conflict judge was needed. Judge Dehen then filed an order taking the notice to remove under advisement. On November 2, 2023, the court of appeals stayed Judge Dehen's order and writ at the Attorney General's request. And on November 15, 2023, the court of appeals issued a special term order granting a writ of prohibition and vacating Judge Dehen's order and writ. *In re Lindahl-Pfieffer* (*"Lindahl-Pfieffer II"*), No. A23-1655, 2023 WL 7986439 (Minn. App. Nov. 15, 2023). The court of appeals reasoned that its order in the first case "squarely addressed" the "legal issue of the judge's authority to unilaterally set the court reporter's salary by order," *id.* at *1, and precluded the district court reconsidering the issue. It

11

therefore concluded that Judge Dehen's second order and writ of mandamus, like the first ones, were "unauthorized and must be vacated." *Id.* at *2. The court of appeals also specifically found that Judge Dehen had a conflict of interest:

> The record establishes that the judge in this case (a) initiated a proceeding in district court and assigned it to himself; (b) filed additional documents in a closed file after this court vacated the judge's decision and did not remand; (c) filed an "information" containing numerous factual allegations and then adopted those allegations as the court's findings of fact in a matter known to be contested; and (d) twice filed orders and writs setting the salary of the court reporter he has directly supervised for years. It was a conflict for the judge to initiate a proceeding involving the salary of his own court reporter and to decide it.

*Id.*

### *The Panel's Findings Related to Court Reporter Salary Dispute*

The panel found that the Board had proved by clear and convincing evidence that Judge Dehen "had a clear disqualifying conflict of interest in the proceedings. Specifically, he initiated the proceedings, he was beneficially interested in their outcome, and remained as the judge in them." Judge Dehen had testified before the panel that before he issued the writs, he had concluded from his research that, besides believing he had inherent authority to issue the orders and writs, the provisions of the Code of Judicial Conduct regarding conflicts of interest did not apply because he was acting under his inherent authority. The panel found that this belief "was unfounded and contrary to case law." The panel observed that the case that Judge Dehen cited, *Clerk of Court's Compensation for Lyon County v. Lyon County Commissioners*, 241 N.W.2d 781, 786 (Minn. 1976), "specifically stated that a judge asserting his or her inherent authority may not act as the deciding judicial officer." The panel further concluded that "in light of existing case law and his beneficial interest in

12

a case to set the salary of his court reporter, Judge Dehen should have known that he had a conflict of interest before the Court of Appeals told him he had one." The panel concluded that by issuing the writs involving his court reporter's compensation, Judge Dehen violated the Code of Judicial Conduct, specifically Rules 1.1,[1] 1.2,[2] 2.2,[3] 2.5,[4] 2.6(A),[5] and 2.11.[6]

### Facts Relating to Guardianships for At-Risk Juveniles

In 2023 and 2024, Judge Dehen was assigned to preside over a number of cases in which he was requested to appoint guardians for at-risk juveniles under Minnesota Statutes chapter 257D. That chapter is relatively new. The Legislature enacted it in 2022. *See* Act of April 13, 2022, ch. 45, §§ 1–12, 2022 Minn. Laws 73, 73–76 (codified at Minn. Stat. §§ 257D.01–1.12 (2024)). The purpose of a guardianship under chapter 257D "is to provide an at-risk juvenile with guidance, assistance, financial and emotional support, and

---

[1] *See* Rule 1.1, Code of Judicial Conduct (CJC) ("A judge shall comply with the law, including the Code of Judicial Conduct.").

[2] *See* Rule 1.2, CJC ("A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.").

[3] *See* Rule 2.2, CJC ("A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially.").

[4] *See* Rule 2.5, CJC ("(A) A judge shall perform judicial and administrative duties competently and diligently. (B) A judge shall cooperate with other judges and court officials in the administration of court business.").

[5] *See* Rule 2.6(A), CJC ("A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law.").

[6] *See* Rule 2.11, CJC (providing in part that "[a] judge shall disqualify himself . . . in any proceeding in which the judge's impartiality might reasonably be questioned.").

13

referrals to resources necessary to either or both . . . meet the at-risk juvenile's needs," or "protect the at-risk juvenile from sex or labor trafficking or domestic or sexual violence." Minn. Stat. § 257D.02.  An "at-risk juvenile" is defined as "an unmarried person who is between the ages of 18 and 21 and is potentially eligible for classification under United States Code, title 8, section 1101(a)(27)(J), as amended through December 31, 2021." Minn. Stat. § 257D.01, subd. 4.

The referenced portion of federal code defines a subset of those individuals who are classified as "special immigrant[s]" under federal law.  *See* 8 U.S.C. § 1101(a)(27)(J).[7]  A non-citizen juvenile who obtains special immigration status under federal law can work and seek permanent residency in the United States.  *See In re Guardianship of Guaman*, 879 N.W.2d 668, 671 (Minn. App. 2016).  But "findings by a state court do not bestow any immigration status on . . . applicants."  *Id.*  Rather, these predicate findings simply "allow

---

[7]     Specifically, part of the group defined as "special immigrant[s]" includes:

An immigrant who is present in the United States—
(i)     *who has been* declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or *placed under the custody of*, an agency or department of a State, or *an individual or entity appointed by a State or juvenile court located in the United States*, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law;
(ii)    for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; *and*
(iii)   in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status . . . .

8 U.S.C. § 1101(a)(27)(J) (emphasis added).

14

an immigrant to apply for [special immigrant juvenile] status [with the relevant federal authority]. If an application is submitted, [United States Citizenship and Immigration Services] then determines whether the applicant meets the requirements for [special immigrant juvenile] status under federal law." *Id.* at 671–72 (citation omitted); *see* 8 C.F.R. § 204.11(b)(5) (2025) (noting requirement of "consent from the Secretary of Homeland Security to classification as a special immigrant juvenile").

> For a juvenile to qualify for at-risk guardianship, they must prove that:
>
> (1) the proposed guardian is capable and reputable;
> (2) the guardianship is in the best interests of the at-risk juvenile;
> (3) both the petitioner and the proposed guardian agree to the establishment of a guardianship under [chapter 257D];
> (4) reunification of the at-risk juvenile with one or both parents is not viable because of abandonment, abuse, neglect, or a similar basis that has an effect on the at-risk juvenile comparable to abandonment, abuse, or neglect under Minnesota law; and
> (5) it is not in the best interests of the at-risk juvenile to be returned to the previous country of nationality or last habitual residence of the juvenile or the juvenile's parents or parent.

Minn. Stat. § 257D.08, subd. 1. "The court must issue an order awarding a guardianship for the purposes identified in section 257D.02 if the court finds that" those requirements are met. Minn. Stat. § 257D.08, subd. 1. "Best interests" for purposes of this inquiry are defined in Minn. Stat. § 257D.01, subd. 5, by cross-reference to Minn. Stat. § 260C.511(a), to mean "all relevant factors to be considered and evaluated."

The guardianship that is created under chapter 257D is unlike other guardianships authorized by Minnesota law. The individuals for whom the guardianship is created are legal adults, above the age of majority; they must be ages 18 to 21, Minn. Stat. § 257D.01, subd. 4, and the guardianship automatically expires on their 21st birthday, Minn. Stat.

15

§ 257D.10. Because at-risk juveniles are not minors, absent a guardianship they would be presumed to be able to make their own decisions, and no one would ordinarily be obligated to assist them. Nothing in chapter 257D explicitly gives a guardian appointed for an at-risk juvenile any rights with respect to the juvenile, or any responsibilities toward the juvenile. Indeed, it specifically provides that the guardian may not limit the juvenile's rights, *see* Minn. Stat. § 257D.07, subd. 2, and that other statutory provisions relating to guardianships are not applicable to a guardianship created under chapter 257D. Minn. Stat. § 257D.12.

The panel's finding of misconduct is based on Judge Dehen's actions in proceedings relating to five guardianship petitions: the Corpeno, Ayala, X.V.L., A.M.A., and J.C.L. petitions.[8] As discussed below, in four of these matters, Judge Dehen denied the guardianship petition. Two of those decisions were appealed by the petitioners and reversed by the court of appeals. *See In re Guardianship of Corpeno*, 2 N.W.3d 595 (Minn. App. 2024); *In re Guardianship of Ayala*, No. A23-1298, 2024 WL 763624 (Minn. App. Feb. 20, 2024) (order opinion). The other two decisions were not appealed. In each of the appealed cases, Judge Dehen granted the guardianship petition on remand. In the fifth matter, the petitioner's counsel brought a motion to remove Judge Dehen for cause

---

[8] In his brief and addendum, Judge Dehen attempted to introduce evidence of his actions and rulings in other proceedings, some of which were at-risk juvenile guardianship matters under chapter 257D, and some of which were not. The Board filed a motion to strike Judge Dehen's addendum, including these materials, and references to the addendum materials in Judge Dehen's brief, arguing in part that these materials are outside the record on appeal. Judge Dehen did not file a response to the motion, but he argued against the motion in his principal brief and invited us to re-open the record under Rule 14(c), Rules of Board on Judicial Standards (RBJS). We decline that invitation. Because Judge Dehen's addendum contained materials that were not part of the record or are not helpful for our decision, we grant the Board's motion.

16

pursuant to Minn. R. Civ. P. 63.03, after Judge Dehen conducted a hearing but before he issued an order. The Chief Judge of the district granted the motion to remove; therefore, Judge Dehen never issued an order.

Judge Dehen first heard a petition for guardianship of an at-risk juvenile on January 23, 2023. The petition was filed by Jeferson DeJesus Lemus Corpeno.[9] In his affidavit in support of the petition, Corpeno stated that he was 18 years old and had arrived in the United States from El Salvador in late January 2022. Authorities then released him to his paternal grandmother who lived in Minnesota. His affidavit stated that when his mother was pregnant with him, his father abandoned the family. Then, when he was three or four years old, his mother abandoned him and left him in the care of his maternal grandmother. Corpeno's affidavit described how he had been threatened and assaulted by gang members in El Salvador and was scared for his life.

At the hearing, Corpeno's attorney explained to Judge Dehen the Minnesota statute for the appointment of guardians for at-risk juveniles and the findings the court needed to make to appoint a guardian. Judge Dehen asked the attorney if granting the petition would cause financial ramifications to the State of Minnesota and, when the attorney mentioned that if Corpeno were designated an at-risk juvenile, he "would have to apply for his immigration benefit before he turns 21," Judge Dehen asked "what's the immigration benefit?" The attorney explained that the court itself would not be granting immigration

---

[9]     We refer to petitioner as Corpeno, consistent with the case captions in the district court and court of appeals matters. But we recognize that he provided his full name as Jeferson DeJesus Lemus Corpeño.

benefits, but that Corpeno was seeking from immigration authorities the right to work and live in the United States under permanent legal status.

Judge Dehen denied the petition on April 17, 2023. Although Judge Dehen reasoned that the proposed guardian was capable and reputable, that the guardianship would be in Corpeno's best interests, and it was not in Corpeno's best interests that he be returned to El Salvador, Judge Dehen reasoned that Corpeno failed to prove that "reunification of the at-risk juvenile with one or both parents is not viable because of abandonment, abuse, [or] neglect" under Minnesota law. Corpeno's attorney, who has handled approximately 20 guardianship petitions for at-risk juvenile clients, stated that Corpeno's was the only one that was denied.

Corpeno appealed the denial of the petition. On January 29, 2024—after Judge Dehen had already acted on the guardianship petitions in the Ayala and X.V.L. matters and held hearings on the A.M.A. and J.C.L. matters (all of which are described below)—the court of appeals issued a decision, reversing and remanding Corpeno's case to the district court for Judge Dehen to conduct further proceedings. *In re Guardianship of Corpeno*, 2 N.W.3d 595 (Minn. App. 2024).[10] The court of appeals issued its decision without adversarial briefing. The court held that Judge Dehen had made insufficient findings regarding reunification, *id.* at 598–600, and it remanded for Judge Dehen "to address all bases for 'abandonment' for each parent put at issue by the petition." *Id.* at 600. In a footnote, the court of appeals observed:

---

[10]     The court of appeals' decision in *Corpeno* appears to have been the first appellate decision substantively addressing the requirements of chapter 257D.

18

> At the hearing, the district court inquired about potential collateral consequences if it granted the petition. While we do not fault the district court for seeking to understand the broader context of this new statute, we note that because this case involved no allegation that the relevant statutory language is ambiguous, the district court's decision whether to grant a petition filed under section 257D.03, subdivision 2, was required to be based on the statutory criteria set forth in Chapter 257D, rather than asserted or perceived collateral consequences of the decision.

*Id.* at 598 n.2 (citations omitted). On remand, Judge Dehen issued an order granting Corpeno's petition.

The second petition at issue in this judicial discipline matter was brought by Jeymy Marmol Ayala. On June 12, 2023, Judge Dehen held a hearing on the petition. Ayala stated in her affidavit that she was born in October 2002 and arrived in the United States from Honduras in November 2021. She stated that her father disappeared when she was 2 1/2 years old. Then, while Ayala was living with her mother, her mother's boyfriend abused her, and her mother did nothing to protect her. During the hearing, Judge Dehen asked Ayala if she was in the United States legally or illegally. Her attorney clarified that she was going through a process to obtain a visa, and that she needed a guardianship for the purpose of seeking a visa. Ayala's attorney became concerned about Judge Dehen's questions and his focus on details that the attorney felt were irrelevant to the case. Judge Dehen's questions caused the attorney to become concerned that he was biased against Ayala due to her immigration status.

On August 15, 2023, Judge Dehen denied Ayala's petition. He found that the proposed guardian was capable and reputable, and that reunification with one or both parents was not viable because of abandonment or neglect. But he did not find that the

19

guardianship was in Ayala's best interests, and he likewise declined to make a finding that it was not in Ayala's best interests that she be returned to Honduras. In his findings regarding whether guardianship was in Ayala's best interests, he noted that it was not clear what benefits a guardianship would provide her, and that the guardianship would only last for a few months. He also mentioned that the guardianship was not the "least restrictive alternative." As to returning to Honduras, Judge Dehen stated that Ayala had significant ties to Honduras: she spent the majority of her life there, she spoke the relevant language fluently, and the father of her child lived there. By contrast, she had not established a permanent placement in the United States, and she required an interpreter in order to communicate in English.

After Ayala unsuccessfully sought reconsideration, she appealed. On February 20, 2024, the court of appeals issued a nonprecedential order opinion, again without adversarial briefing, reversing and remanding the case to the district court. *In re Guardianship of Ayala*, No. A23-1298, 2024 WL 763624 (Minn. App. Feb. 20, 2024) (order opinion). This opinion was issued after Judge Dehen had already acted on the guardianship petitions in the X.V.L. and J.C.L. matters, described below, and held a hearing on the A.M.A. matter, also described below. The court of appeals concluded that in making his best-interests determination, Judge Dehen had abused his discretion, and that many of his findings were against logic and the facts in the record.

Specifically, although Judge Dehen found that Ayala's needs had been met by her informal relationship with the guardian, the court of appeals noted Ayala's testimony that a guardianship would assist her, and that the existence of an informal relationship did not

20

preclude benefits that might arise in a more formal guardianship relationship. *Id.* at *2. The court of appeals also concluded that factors that Judge Dehen had considered, including the short duration the guardianship could last before it expired, and whether it was the least-restrictive alternative, were not relevant to Ayala's best interests. *Id.* And the court of appeals concluded that Judge Dehen abused his discretion when he failed to determine it was not in Ayala's best interests not to return to Honduras, noting her fears about abuse in that country and other errors in his findings and reasoning. *Id.*

The court of appeals also mentioned that Ayala had raised "concerns of bias by the district court judge based on questions . . . about her immigration status and certain findings in the district court's order." *Id.* at *3. The court "agree[d] that certain comments by, inquiries from, and findings of the district court are not relevant to Ayala's petition," but, noting that she had not requested any relief related to the alleged bias, it pointed out that "the process for removal of a judicial officer for bias . . . is available to Ayala on remand." *Id.* On remand, Ayala's attorney filed a motion to remove Judge Dehen from the case. Judge Dehen denied the motion, but he granted the guardianship petition in an order issued on February 27, 2024.

The third petition for appointment of a guardian was brought by X.V.L. On October 2, 2023, Judge Dehen held a hearing on the petition. As in the Ayala hearing, Judge Dehen inquired whether X.V.L. was in the country legally or illegally, along with other topics. When Judge Dehen asked what benefits X.V.L. was likely to achieve from the guardianship, X.V.L.'s attorney explained that the benefit to be derived from the guardianship was that "there is an advantage in immigration to allow them to reside here

21

legally." Judge Dehen also inquired about whether the proposed guardian was in the country legally or illegally; the proposed guardian said that he was in the country illegally and did not speak any English. X.V.L.'s attorney testified that he thought these questions were "unusual and not directly related to the issues in the Petition," but he recognized that "judges need to ask questions to better understand the matters before them."

On December 4, 2023, Judge Dehen denied X.V.L.'s petition. In his order, he found that X.V.L. failed to present sufficient evidence that the guardianship was being sought for the purposes identified in the statute. Instead, Judge Dehen found that X.V.L. was seeking the guardianship for immigration benefits and that this was not an enumerated purpose of the guardianship statute. He also concluded that the proposed guardian was not capable and reputable, in part because of his immigration status and "his inability to speak any amount of English after five years in the Twin Cities metropolitan area." And he concluded that X.V.L. had presented insufficient evidence on specific reasons why it was not in her best interests to return to Nicaragua. X.V.L. did not appeal the decision; her attorney testified that she lacked the money to do so.

The fourth petition at issue was brought by A.M.A. During the hearing, which was held on November 27, 2023, A.M.A.'s attorney became concerned about the questions that Judge Dehen was asking A.M.A. Specifically, the attorney testified by affidavit before the panel that she "found it very unusual that Judge Dehen began asking questions," which "has not been my experience in other guardianship proceedings," and the attorney "became

22

concerned when he started to ask questions that inquired into [A.M.A.'s] immigration status, including questions of how she got [to the] United States."[11]

Following the hearing, and before Judge Dehen had issued an order, A.M.A.'s attorney filed a motion to remove Judge Dehen from the case for cause. In support of her motion, she included the transcript of proceedings, as well as the order and transcript in the Ayala matter, the order in the X.V.L. matter, and another order in a different case, not decided by Judge Dehen, which A.M.A.'s attorney indicated was "an example of how other judges in the tenth judicial district treat at-risk juvenile petitions." She argued that:

> Judge Dehen's pattern of questioning, focus on the immigration status of the petitioners and respondent in the aforementioned matters, as well as his questioning of the petitioner juvenile in the present matter, raise concerns that he may be biased against both petitioner juvenile and her proposed guardian based on their race, national origin, and ethnicity.

And she argued that:

> Judge Dehen's pattern of declining to apply the law enacted by the legislature in MN Stat. § 257D . . . also raises concern that he allows his personal views of the law with regard to protecting juveniles he deems to be present in the U.S. without proper authorization, to influence his application of the law.

---

[11] The transcript reflects that Judge Dehen did not ask whether A.M.A. was in the country legally or illegally, and he did not ask questions about her "immigration status" as such. Indeed, the first use of the word "immigration" in the transcript was by A.M.A.'s attorney. Judge Dehen was asking questions about how A.M.A. traveled to the United States, and when he asked A.M.A. "what prevents you from being in Ethiopia," A.M.A.'s attorney objected that "I'm not sure that's a proper question considering this is a state court and her immigration matter is completely separate." But A.M.A.'s attorney eventually conceded that in order to grant a guardianship, Judge Dehen would have to make a finding that it was not in A.M.A.'s best interests to return to Ethiopia.

Later, Judge Dehen asked counsel whether it was correct that "this immigration stuff created by congress, it leapfrogs other people into a special status, an immigration status, true?" A.M.A.'s attorney responded that that was "irrelevant for this Court though," because "[t]he cause of action for this matter is created by a state statute."

23

On January 12, 2024, Judge Dehen denied the motion for removal. A.M.A.'s attorney filed a request for reconsideration with the then-Chief Judge of the district.

On March 5, 2024—after the court of appeals issued its *Corpeno* and *Ayala* decisions on January 29, 2024, and February 20, 2024, respectively—the Chief Judge granted A.M.A.'s motion to remove Judge Dehen from her case. In his findings of fact and conclusions of law, the Chief Judge found that in A.M.A.'s matter, Judge Dehen "asked a variety of questions . . . that gave the appearance that he was considering the immigration status or perceived immigration status of the juvenile," specifically "how the juvenile got to the United States, who paid for her trip, and the route she took to enter the United States." The Chief Judge also concluded that "Judge Dehen has a history of explicitly and implicitly inquiring into the immigration status of both Petitioners and Respondents in the at-risk juvenile guardianship cases that come before him," including asking "whether they are 'here legally or illegally,' " and also referencing Judge Dehen's findings that an inability to speak English affected a petitioner's best interests and a proposed guardian's suitability. The Chief Judge concluded that these facts "would cause a reasonable examiner to question Judge Dehen's impartiality and to question whether his bias against what he[] perceives to be illegal immigration impairs his ability to determine w[he]ther the proposed ward [sic] is an at-risk juvenile." Accordingly, the Chief Judge found that Judge Dehen was disqualified from hearing the case under the Code of Judicial Conduct, and the case was reassigned to another judge.

The fifth petition at issue was brought by J.C.L.[12]   The hearing was held on November 15, 2023.  During the hearing, J.C.L.'s attorney was eliciting testimony from J.C.L. when Judge Dehen noted that her 21st birthday was about a week away.  Judge Dehen then asked a question to clarify that J.C.L. wanted the proposed guardian, her mother, to be her guardian for one week.  At this point, J.C.L.'s attorney volunteered that "this action is filed to – in hopes to obtain an immigration benefit as well."  After the hearing but before Judge Dehen issued a decision, the court of appeals issued its decision in *Corpeno*, in which, as noted above, the court of appeals cautioned that "the district court's decision whether to grant a petition . . . was required to be based on the statutory criteria set forth in Chapter 257D, rather than asserted or perceived collateral consequences of the decision."

On February 12, 2024, Judge Dehen issued an order denying J.C.L.'s petition.  In the order, Judge Dehen concluded that "the Court cannot find that it is not in Petitioners' best interests that she be returned to Ecuador."  Judge Dehen also observed:

> Petitioner's attorney stated that the purpose of needing a week-long guardianship at twenty years of age is that Petitioner hoped to obtain an immigration benefit.  The Court finds that this is not aligned with the purposes of this type of guardianship as enumerated in Minn. Stat. § 257D.02.  The Court further finds that Petitioner presented insufficient evidence to meet her burden of proof to show that she is seeking the establishment of a guardianship for the purposes identified in Minn. Stat. § 257D.02.

---

[12]     Although Judge Dehen held a hearing on the J.C.L. petition before the hearing on the A.M.A. petition, the panel, in its findings, addressed the A.M.A. petition first.  We do the same.

Later in the order, Judge Dehen explained this finding, accurately citing the statutory purposes as well as the court of appeals' guidance from the *Corpeno* decision:

> 10.    The purpose of a guardianship established under Minn. Ch. 257D "is to provide an at-risk juvenile with guidance, assistance, financial and emotional support, and referrals to resources necessary to either or both: (1) meet the at-risk juvenile's needs, which include but are not limited to shelter, nutrition, and access to and receipt of psychiatric, psychological, medical, dental, educational, occupational, or other services; or (2) protect the at-risk juvenile from sex or labor trafficking or domestic or sexual violence." Minn. Stat. § 257D.02. The district court is not allowed to consider potential collateral consequences. *Corpeno*, 2024 WL 316430, at *2 n.2.

> 11.    The Court concludes that Petitioner failed to present sufficient evidence that this guardianship is being sought for the purposes identified in Minn. Stat. § 257D.02, which is required under Minn. Stat. § 257D.08, subd. 1. Instead, Petitioner's attorney stated that Petitioner is seeking the guardianship for immigration benefits, which is not enumerated in that section of Minnesota law, and therefore cannot be considered by the Court.

J.C.L.'s attorney testified that he has represented juveniles in approximately 10 at-risk juvenile guardianships, and that J.C.L.'s petition was the only one that was denied.

The other three Anoka County judges on the juvenile assignment provided information to the panel about how at-risk juvenile guardianship proceedings are handled. Specifically, Judge Lehmann provided testimony that the guardianship "allows the minor to apply for special immigration status, but that is not the focus of the guardianship proceedings," which instead "provide a proposed guardian with legal standing to help the juvenile get education, medical services, etc." Judge McCarthy testified about a meeting that she had with Judge Dehen, Judge Lehmann, and Judge Stanfield in which:

> Judge Stanfield presented a summary of the law, what it says, what judges can and cannot do. We discussed what the law says and what questions you can't ask, and while you may not agree with the law that it is the judge's job

26

to follow the law. It's not discretionary. We answered Judge Dehen's questions, but it was a limited discussion. It appeared to me that he disagreed with the law and the policy behind it, and that he didn't appreciate why his questions were inappropriate.

And Judge Stanfield testified that:

When I first came onto the juvenile assignment, Judge Dehen asked me about At-Risk Juvenile Guardianship cases. I spoke with him on the phone to share research that I had done on the subject, explaining the law as I understood it. Judge Dehen responded that he thought this was an immigration issue, a means to bypass normal immigration channels to stay in the country and he had a hard time with that. I told him that was not correct, that the immigration status was not an issue for us to decide and that he could not ask questions about immigration. He made it clear that he did not agree with me.

Judge Stanfield further testified that at the meeting between the four judges, "Judge McCarthy told Judge Dehen that although he may not like the immigration consequences, he could not act based on that."

### *The Panel's Findings Related to Guardianships for At-Risk Juveniles*

The panel found that the Board had proved by clear and convincing evidence that Judge Dehen violated the Code of Judicial Conduct "by failing to follow the statutory requirements for a juvenile to qualify for at-risk guardianship." Specifically, the panel found that "Judge Dehen asked petitioners in these cases about their immigration status and took the position that immigration benefits were not aligned with the purpose of the at-risk juvenile guardianship statute. His position was contrary to both state and federal law."

In coming to this conclusion, the panel reasoned that "Judge Dehen specifically rejected immigration benefits as an appropriate reason to seek an at-risk juvenile guardianship, notwithstanding that the state statute specifically refers to at-risk juveniles

27

applying for special immigration status under the federal law." Although it noted that "judicial error is not a basis for discipline," the panel reasoned that "the statutory factors that determine whether a court should grant an at-risk juvenile guardianship are clear and determined." And it stated that "[p]otential immigration benefits to a juvenile are not grounds for denying a petition." The panel reasoned that:

> Judge Dehen's findings and conclusions of law in the above listed . . . cases, together with the questions he asked at the hearings and the view he voiced to his colleagues that the law should not be used to assist at-risk juveniles in seeking immigration benefits, manifested a bias against the law and non-citizen juveniles seeking immigration benefits.

And it found that "[h]is testimony that he merely made an error of law in these cases and was not opposed to granting such petitions was not credible."

The panel also reasoned that "even after being told by his judicial colleagues that a juvenile's immigration status was not to be considered when deciding if he or she qualified as an at-risk juvenile, Judge Dehen did not alter his position." It concluded that "[h]e did not act impartially, and his conduct showed prejudice against non-citizen juveniles seeking special immigration status." Against Judge Dehen's argument that any error of law he made does not constitute misconduct, the panel reasoned that an error "may constitute misconduct when it convincingly reflects bias, intentional disregard for the law, or any purpose other than the faithful discharge of judicial duty." And it reasoned that "Judge Dehen did not agree that Minnesota's at-risk juvenile guardianship statute should be used to assist non-citizen juveniles in obtaining immigration benefits," and he "allowed his disagreement with the statute's goal to influence his decisions and deprived the parties of the right to an impartial judge." The panel concluded that by his questions and decisions

28

in these matters, Judge Dehen violated the Code of Judicial Conduct, specifically Rules 1.1,[13] 1.2,[14] 2.2, [15] 2.3(A),[16] and 2.5.[17]

### *Facts and Panel Findings Relating to Remote Calendar*

On November 4, 2022, Judge Dehen presided over a remote juvenile court calendar, which included confidential matters. While presiding over this calendar, he was riding in a moving vehicle. His wife was driving and he was in the passenger seat. Judge Dehen told the lawyers appearing on the calendar that he was on vacation but had decided to hold court. But there is no record that Judge Dehen had requested vacation that day. When Judge Dehen responded to the Board's inquiry into this matter, he never mentioned that he had been scheduled for vacation that day or that he had a calendar assigned to him. Instead, he told the Board that he had an opportunity to attend a swim meet at which a family member was competing.

---

[13] *See* Rule 1.1, CJC ("A judge shall comply with the law, including the Code of Judicial Conduct.").

[14] *See* Rule 1.2, CJC ("A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.").

[15] *See* Rule 2.2, CJC ("A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially.").

[16] *See* Rule 2.3(A), CJC ("A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice.").

[17] *See* Rule 2.5, CJC (as relevant here, providing that a "judge shall perform judicial and administrative duties competently and diligently.").

29

Judge Dehen admitted that holding court from his vehicle was a bad idea and that his actions left some of the participants in the proceedings that day feeling that it was inappropriate and unprofessional. Indeed, three of the attorneys who made appearances before Judge Dehen that day provided testimony to the panel that they were "shocked" by his actions, that they found them "highly unusual and distressing," surprising, and "inappropriate." The panel found that "Judge Dehen's conduct compromised the decorum, seriousness and professionalism expected from judges in judicial proceedings." And it concluded that he violated the Code of Judicial Conduct, specifically Rules 2.1,[18] 2.4,[19] and 2.8.[20]

### The Panel's Recommendation for Discipline

Based upon the violations that the panel concluded Judge Dehen committed related to all these matters, the panel recommended that Judge Dehen be censured and suspended from judicial office without pay for six months.

## ANALYSIS

This matter requires us to consider whether Judge Dehen committed misconduct with respect to three different groups of facts alleged by the Board and found by the panel.

---

[18]     *See* Rule 2.1, CJC ("The duties of judicial office, as prescribed by law, shall take precedence over all of a judge's personal and extrajudicial activities.").

[19]     *See* Rule 2.4, CJC (as relevant here, providing that a "judge shall not permit family, social, . . . or other interests or relationship to influence the judge's judicial conduct or judgment.").

[20]     *See* Rule 2.8, CJC (as relevant here, providing that a "judge shall require order and decorum in proceedings before the court.").

As part of this inquiry, Judge Dehen's arguments that he did not commit misconduct require us to address the standard of proof for judicial misconduct in ways that we have not done before. It also requires us to consider what discipline is appropriate for Judge Dehen, both as a judge and as an attorney, for any misconduct that we conclude was established.

We begin, in Part I, by addressing Judge Dehen's argument that what he calls the "legal errors test" should govern the alleged misconduct in this case. We conclude that, as to the alleged misconduct regarding the court reporter salary dispute and guardianship for at-risk juveniles cases, it should. We then assess, in Part II, whether Judge Dehen's actions with respect to the dispute over his court reporter's compensation, when viewed under the legal errors test, constitute judicial misconduct. We conclude that they do. In Part III, we assess Judge Dehen's actions with respect to the at-risk juvenile guardianship proceedings. As part of that inquiry, Judge Dehen invites us to address what standards should apply in assessing whether a judge violates the requirement, under Rule 2.3(A) of the Code of Judicial Conduct, to "perform the duties of judicial office . . . without bias or prejudice." After clarifying the standard, we conclude that Judge Dehen's actions in this regard do not constitute misconduct. And in Part IV, we assess whether Judge Dehen's actions in conducting court proceedings from a moving car constitute misconduct. We conclude that they do.

We next turn to the appropriate discipline. In Part V, we consider what judicial discipline is appropriate for Judge Dehen's misconduct. We conclude that censure and a nine-month suspension from judicial duties, without pay, is the appropriate sanction as a

31

judge. We further conclude that, in order to ensure that the sanction we impose will be effective, if Judge Dehen ceases to be a judge before his term of judicial suspension ends, then he will be suspended from the practice of law for a term equal to the balance of his judicial suspension. Finally, in Part VI, we consider what attorney discipline is appropriate for Judge Dehen's misconduct. We conclude that the appropriate attorney discipline is a public reprimand.

## I.

"Conduct that constitutes a violation of the Code of Judicial Conduct" is a ground for judicial discipline. Rule 4(a)(6), RBJS. The Board has the burden of proving by clear and convincing evidence that a judge engaged in the misconduct. Rule 10(b)(2), RBJS. Clear and convincing evidence requires that "the truth of the facts asserted is highly probable." *In re Miera*, 426 N.W.2d 850, 853 (Minn. 1988) (citation omitted) (internal quotation marks omitted).

We "make an independent assessment of whether the Board has proven that a judge violated a provision of the Code of Judicial Conduct." *In re Karasov*, 805 N.W.2d 255, 263 (Minn. 2011); *see also* Rule 14(e), RBJS. In making this assessment, however, we give deference to the facts found by the panel. Rule 14(e), RBJS. As a result, we "will defer to the panel's factual findings unless they are clearly erroneous." *Karasov*, 805 N.W.2d at 264.[21]

---

[21] Judge Dehen argues that the panel's findings of fact, conclusions of law, and recommendations should be reviewed under the standards set forth in the Minnesota Administrative Procedure Act, Minn. Stat. §§ 14.001–.69 (2024). But the Act does not apply to the Judicial Branch. Minn. Stat. §§ 14.02, subd. 2, 14.03, subd. 1.

A judge must comply with and uphold the law. *See* Rules 1.1, 2.2, Code of Judicial Conduct (CJC). Much of the misconduct found by the panel was based on its conclusions that Judge Dehen failed to or refused to comply with the law in legal rulings he made, both with respect to the court reporter salary dispute and with respect to the at-risk juvenile guardianship proceedings. But we have never addressed the standard for determining whether a judge's allegedly incorrect legal reasoning amounts to misconduct. Accordingly, we now address this issue of first impression.

Judge Dehen argues that the panel failed to consider what he calls the "legal errors test," which he contends is found in Rule 4(c), RBJS. He further argues that the panel's failure to explicitly apply the "legal errors test" is fatal to the panel's findings regarding his allegedly incorrect rulings. Rule 4, RBJS, governs "Grounds for Discipline or Other Action." It provides in part:

> (c) Proceedings Not Substitute for Appeal. The board shall not take action against a judge for making findings of fact, reaching a legal conclusion, or applying the law as understood by the judge unless the judge acts contrary to clear and determined law and the error is egregious, made in bad faith, or made as part of a pattern or practice of legal error. Claims of error shall otherwise be left to the appellate process.

Rule 4(c), RBJS.

We first note that Rule 4(c) applies, by its terms, only to the actions of the Board itself. But Judge Dehen urges us to apply a similar principle in our own decisions. Notably, the Board does not dispute the principle set out in Rule 4(c), nor suggest that the principle should not be applied by this court. Instead, the Board argues that Rule 4(c) is applicable only to discipline that is imposed for legal error—and not, for instance, improper behavior

or bias. Likewise, the panel itself implicitly applied a version of the principle set out in Rule 4(c), noting that "judicial error is not a basis for discipline," but "[a]n error of law . . . may constitute misconduct when it convincingly reflects bias, intentional disregard of the law, or any purpose other than the faithful discharge of judicial duty." The panel also recognized "that judges sometimes make good faith errors of law and that these errors are not grounds for discipline," but reasoned that Judge Dehen "failed to apply clear and determined law."

We see no reason that the standards we have set out for the Board to follow in Rule 4(c) should not also apply to our own determinations. The principles set out in Rule 4(c) are straightforward and sensible. Judges, being human, are not perfect, and the Code of Judicial Conduct does not require them to be. Instead, it requires that they make a good-faith effort to make findings of fact and conclusions of law, and apply the law to the facts as they understand it and as instructed by applicable precedent. Despite a judge's best efforts, any judge may nevertheless issue a ruling on the law or facts that is later determined to be reversible error. A jurisprudence that treats every judicial error as misconduct would effectively render every judge a violator of the Code of Judicial Conduct. Something more is required.

Accordingly, we conclude that a judge does not commit judicial misconduct based *solely* on the judge's erroneous legal or factual rulings. Instead, additional factors must be present to turn legal error into misconduct: the error must be "contrary to clear and determined law" and must be "egregious, made in bad faith, or made as part of a pattern or practice of legal error." Rule 4(c), RBJS. For these purposes, Judge Dehen does not appear

34

to dispute that "bad faith" includes bias. *Cf. In re Barr*, 13 S.W.3d 525, 534 (Tex. Rev. Trib. 1998) ("A specific intent to use the powers of the judicial office to accomplish a purpose which the judge knew or should have known was beyond the legitimate exercise of his authority may in and of itself constitute bad faith."); *In re Ginsberg*, 630 S.W.3d 1, 8 (Tex. Spec. Ct. Rev. 2018) (same). We therefore agree with the contention made by both the Board and the panel that a decision based not on a judge's understanding of the law, but on the judge's bias, violates the Code of Judicial Conduct.

But Judge Dehen's larger argument—that the panel's failure to cite and apply Rule 4(c) is a basis to disregard its findings—is unpersuasive. As noted above, Rule 4(c) provides only that "[t]he board shall not take action" except in certain circumstances; not only does it not purport to control this court, it also does not purport to control panels. Accordingly, the panel's failure to explicitly invoke Rule 4(c) is not surprising and not a defect in its decision. Furthermore, we note again that the panel did make findings consistent with the application of Rule 4(c) when it acknowledged that judges' good-faith errors of law are not grounds for discipline, but concluded that Judge Dehen "failed to apply clear and determined law."

Judge Dehen's argument also suffers from a second flaw. The subject matter governed by Rule 4(c) is, in broad terms, the determination of when legal error amounts to judicial misconduct. Such determinations are the province of this court, which "make[s] an independent assessment of whether the Board has proven that a judge violated a provision of the Code of Judicial Conduct." *Karasov*, 805 N.W.2d at 263. As the Board argues, "this Court can draw its own conclusions concerning the severity of [Judge

Dehen's] misconduct." Judge Dehen presents no reason why the failure of the panel to make an assessment that is ultimately this court's to make should immunize him from a finding of misconduct.

II.

We now turn to the first type of judicial misconduct found by the panel, namely that Judge Dehen violated the Code of Judicial Conduct by issuing the writs of mandamus involving his court reporter's compensation. The root of the panel's conclusions is that Judge Dehen violated Rules 1.1, 1.2, 2.2, 2.5, and 2.11, CJC, by failing to disqualify himself from the writ proceedings because of his conflict of interest, and that he likewise violated Rules 1.1, 1.2, 2.2, and 2.6(A), CJC, by issuing the writs to the district court administrator "without legal authority and without giving the district court administrator a meaningful opportunity to respond to the issues raised by the writs."

The panel's factual findings regarding this misconduct are set forth in greater detail above, but to summarize: Judge Dehen commenced a proceeding for a peremptory writ of mandamus in which he was the only party to the action, identified himself as the party beneficially interested, assigned the matter to himself as a judge, and issued a peremptory writ of mandamus without giving the party to whom the writ was directed, a district court administrator, a fair opportunity to respond—all based on a claim that he could exercise his inherent authority as a judge to set the salary of his court reporter. When the court of appeals vacated the peremptory writ, concluding that he (1) lacked inherent authority to unilaterally set the court reporter's salary, and (2) erred by issuing a peremptory writ when facts were in dispute, he nonetheless began the same process again.

36

To be sure, Judge Dehen made slight changes for the second writ, in an apparent attempt to distinguish the court of appeals' decision. Rather than setting his court reporter's salary at the highest level, he set it at a different level. Rather than issuing a peremptory writ, Judge Dehen issued what he styled as an alternative writ. But an important distinction between a peremptory and an alternative writ is that an alternative writ allows the defendant to "show cause" to demonstrate why they should not be required to perform the particular act the writ seeks to compel. *See* Minn. Stat. § 586.03 (an alternative writ shall "command the defendant that . . . the defendant do the required act, or show cause . . . why the defendant has not done so"); Minn. Stat. § 586.06 ("On the return day of the alternative writ, . . . the party upon whom the writ is served may show cause by answer . . . ."); Minn. Stat. § 586.07 ("If no answer is made, a peremptory mandamus shall be allowed against the defendant."). Because Judge Dehen's "Demand" also directed the district court administrator to immediately comply with his direction to hire the court reporter at a certain salary—without giving the district court administrator an opportunity to defend—the writ was arguably tantamount to a second peremptory writ.

The court of appeals again vacated Judge Dehen's writ, reiterating that he lacked inherent authority to set his court reporter's salary, while also pointing out that Judge Dehen had a clear conflict of interest. Once more, as the court of appeals stated:

> The record establishes that the judge in this case (a) initiated a proceeding in district court and assigned it to himself; (b) filed additional documents in a closed file after this court vacated the judge's decision and did not remand; (c) filed an "information" containing numerous factual allegations and then adopted those allegations as the court's findings of fact in a matter known to be contested; and (d) twice filed orders and writs setting the salary of the court reporter he has directly supervised for years. It was a

> conflict for the judge to initiate a proceeding involving the salary of his own court reporter and to decide it.

*Lindahl-Pfieffer II*, 2023 WL 7986439, at *2.

By failing to disqualify himself in a proceeding in which he was the party in interest, Judge Dehen violated Rule 2.11, CJC. His failure to disqualify himself was also a failure to comply with the law, in violation of Rule 1.1, CJC, and to uphold and apply the law, in violation of Rule 2.2, CJC. It also undermined public confidence in the integrity and impartiality of the judiciary, in violation of Rule 1.2, CJC, and it represented a failure to perform his duties fairly and impartially, in violation of Rule 2.2, CJC, and competently, in violation of Rule 2.5, CJC. Finally, by his repeated issuance of writs of mandamus to the district court administrator, without giving her a reasonable opportunity to respond, Judge Dehen violated Rule 2.6(A), CJC.

Judge Dehen does not claim that any of the factual findings upon which the panel based its conclusions are clearly erroneous. Instead, he argues that the Board and the panel are inappropriately using disciplinary action as a substitute for appellate review when any alleged errors he made in bringing the writ petitions should be governed by the "legal errors test" of Rule 4(c), RBJS. As explained above, we agree that the legal errors test applies. Accordingly, Judge Dehen did not commit misconduct if (1) the law he violated was not "clear and determined," or (2) the error he made was not "egregious, made in bad faith, or made as part of a pattern or practice of legal error." *See* Rule 4(c), RBJS.

Judge Dehen argues that the law regarding whether a judge has inherent authority to set their court reporter's salary was not clear and determined, and that he arrived at his

conclusion on that law in good faith. But the panel's findings of misconduct, while acknowledging that he erred regarding this issue, are not based on that error. Instead, they are based on his having conducted proceedings despite a clear disqualifying conflict: "Judge Dehen violated [various rules] because he failed to disqualify himself from the writ proceedings because of a conflict of interest." Specifically, "he initiated the proceedings, he was beneficially interested in their outcome, and [he] remained as the judge in them," and he "should have known that he had a conflict of interest before the Court of Appeals told him he had one."

Judge Dehen next argues that his failure to recognize his conflict of interest was not contrary to clear and determined law. He first contends that if the law were clear and settled that a conflict of interest existed, the court of appeals would have addressed that issue in its opinion in *Lindahl-Pfieffer I*. We are unconvinced. It is not the job of an appellate court to identify every error that might exist in a lower court decision. Instead, the court is required to do merely what is needed to dispose of the matter. And indeed, the court of appeals' decision in *Lindahl-Pfieffer I* specifically indicated that it was not correcting all the errors that were presented, stating: "Although many of the additional arguments made by [Lindahl-Pfieffer] have merit, we need not address them, in light of our conclusion that no writ of mandamus should have been issued in this case." 2023 WL 7103265, at *2.

We likewise reject Judge Dehen's suggestion that the law regarding his conflict of interest was unclear. In his brief, he argued that he had a good faith basis to believe that there was no clear and unambiguous authority that established he had a conflict of interest. But he does not explain the basis for that belief. Before the panel, Judge Dehen testified

39

that prior to issuing the writs, he had concluded from his research that the provisions of the Code of Judicial Conduct regarding conflicts of interest did not apply because he was acting under his inherent authority. But as the panel determined, this "conclusion was unfounded and contrary to case law." In his brief to the court of appeals in *Lindahl-Pfieffer I*, Judge Dehen relied on our decision in *Clerk of Court's Compensation for Lyon County v. Lyon County Commissioners*, 241 N.W.2d 781 (Minn. 1976). But we held in *Lyon County* that:

> When established and reasonable procedures have failed, an inferior court may assert its inherent judicial power by an independent judicial proceeding brought by the judges of such court or other parties aggrieved. *Such a proceeding must include a full hearing on the merits in an adversary context before an impartial and disinterested district court.*

241 N.W.2d at 786 (emphasis added). Thus, as the panel recognized, in *Lyon County* we "specifically stated that a judge asserting his or her inherent authority may not act as the deciding judicial officer." Judge Dehen does not argue that *Lyon County* is ambiguous with respect to the propriety of a conflicted judge deciding a case involving their own judicial authority, nor does he cite any other authority to cast doubt on this clear statement of the law. We conclude that Judge Dehen's failure to recognize his own conflict of interest in issuing the writs was contrary to clear and determined law.[22]

Under the legal errors test, Judge Dehen may not be disciplined, even for violating clear and determined law, if the error he made was not "egregious, made in bad faith," or

---

[22]    Judge Dehen does not argue that when he twice issued writs of mandamus to the district court administrator, without giving her a reasonable opportunity to respond, his conduct was not contrary to clear and determined law.

40

part of a pattern of error. Rule 4(c), RBJS. Judge Dehen argues that his error did not fall into any of these categories. Specifically, he argues that his error was not egregious, and he proposes that an appropriate definition for "egregious" is error that is extremely or remarkably bad, flagrant, or shocking. *See In re Ginsberg*, 630 S.W.3d at 8. The Board does not suggest an alternate definition.

Assuming without deciding that Judge Dehen's proposed definition for egregious error is correct, we conclude that his error was egregious. Judge Dehen's actions presented an obvious conflict of interest. Judge Dehen acknowledged that he was the party beneficially interested in the writ proceedings, but after initiating those proceedings, he assigned them to himself and then decided them, notwithstanding his own interest. The proposition that "no man can be a judge in his own case" is one of the bedrock principles of our legal system. *See Williams v. Pennsylvania*, 579 U.S. 1, 8–9 (2016) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). A judge must not depart from that principle without justification and authority that are both compelling and unequivocal. Judge Dehen did not meet that standard here. Instead of providing authority that was compelling and unequivocal, justifying his clear conflict of interest, Judge Dehen cited to a decision, *Lyon County*, that confirmed the impropriety of his actions. Under these circumstances, his error was egregious.

Accordingly, we conclude that the Board has proved by clear and convincing evidence that Judge Dehen violated Rules 1.1, 1.2, 2.2, 2.5, 2.6(A), and 2.11, CJC, by his conduct with respect to the court reporter dispute.

III.

We next turn to the panel's conclusion that Judge Dehen violated Rule 2.3(A), CJC, with respect to the at-risk juvenile guardianship cases that were before him. We first address the legal standard applicable to Rule 2.3(A), CJC, before then applying that standard to Judge Dehen's actions here.

A.

As part of its conclusions of misconduct relating to the at-risk juvenile guardianship proceedings, the panel concluded that Judge Dehen violated Rule 2.3(A), CJC, which requires a judge to perform the duties of judicial office "without bias or prejudice." Specifically, the panel found that Judge Dehen "showed prejudice against non-citizen juveniles seeking special immigration status" and "manifested a bias against the law and non-citizen juveniles seeking immigration benefits." Judge Dehen argues that in order to make a finding of bias, the panel was required to prove that he had "actual bias," by which Judge Dehen means "strong and deep impressions that could or would not be set aside to render a decision based on the evidence." Neither party cites to any judicial discipline case, in Minnesota or in any other jurisdiction, that addresses the standard for finding that a judge's conduct implicates bias or prejudice.[23] And we have never addressed that standard. Accordingly, we do so now, giving special attention to the question whether Rule 2.3(A) requires a showing of actual bias, as opposed to merely the appearance of bias.

---

[23]    The Board does not discuss the "actual bias" question except to argue that the record demonstrates that Judge Dehen had actual bias.

42

We begin with the text of the relevant provision. Although the Board alleged, and the panel found, that Judge Dehen violated only part (A) of Rule 2.3, CJC, it is instructive to set out Rule 2.3 in its entirety:

Rule 2.3 Bias, Prejudice, and Harassment

      (A) A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice.

      (B) A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation, and shall not permit court staff, court officials, or others subject to the judge's direction and control to do so.

      (C) A judge shall require lawyers in proceedings before the court to refrain from manifesting bias or prejudice, or engaging in harassment, against parties, witnesses, lawyers, or others based upon attributes including but not limited to race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation.

      (D) The restrictions of paragraphs (B) and (C) do not preclude judges or lawyers from making legitimate reference to the listed factors, or similar factors, when they are relevant to an issue in a proceeding.

Rule 2.3, CJC.

By itself, Rule 2.3(A) requires a judge to "perform the duties of judicial office . . . without bias or prejudice." "Bias" is defined by Black's Law Dictionary as "[a] mental inclination or tendency; prejudice; predilection." *Bias*, *Black's Law Dictionary* (12th ed. 2024). *Black's* likewise defines "prejudice" as "[a] preconceived judgment or opinion formed with little or no factual basis; a strong and unreasonable dislike or distrust." *Prejudice*, *Black's Law Dictionary* (12th ed. 2024). All of these terms refer to the actual

43

mental state of the person alleged to be biased or prejudiced, suggesting that "bias" and "prejudice" refer to having an improper mental state, rather than merely appearing or giving the impression of having such a state. In other words, these terms seem to refer to actual bias.

That conclusion is strengthened by an examination of the other provisions of Rule 2.3. Both Rule 2.3(B) and Rule 2.3(C) refer to "manifesting" bias: Rule 2.3(B) requires a judge not to "manifest bias or prejudice," and Rule 2.3(C) instructs a judge to require lawyers appearing before them to "refrain from manifesting bias or prejudice." Dictionary definitions suggest that "manifesting" bias or prejudice, in this transitive-verb sense, means to *display* or *give the appearance* of bias or prejudice, possibly without regard to whether actual bias is present: "to make evident or certain by showing or displaying," *Merriam-Webster's Collegiate Dictionary* 756 (11th ed. 2014); to "display or show (a quality or feeling) by one's acts or appearance; demonstrate," *New Oxford American Dictionary* 1064 (3d ed. 2010); "[t]o show or demonstrate plainly; reveal," *American Heritage Dictionary of the English Language* 1067 (5th ed. 2018); and "to show plainly" or to "make palpably evident or certain by showing or displaying," *Webster's Third New International Dictionary Unabridged* 1375 (3d ed. 2002).

Likewise, a comment to the rule provides examples of what it means to "manifest bias"; those examples emphasize that "manifest[ing] bias" consists in *conduct* that is evidence of, or could give the appearance of, actual bias. *See* Rule 2.3, CJC, Comment [2]. And Rule 2.3(D) permits judges and lawyers to "mak[e] legitimate reference to the listed factors, or similar factors, when they are relevant to an issue in a proceeding"—again

44

referring to conduct that might give the appearance of bias, and specifying that such conduct is not improper when it implicates relevant matters. Looking at the entire rule, then, it appears that Rule 2.3(A) forbids a judge from "bias or prejudice," and Rule 2.3(B) forbids a judge from conduct that might give the *appearance* of bias or prejudice. This reinforces the idea that "bias or prejudice" in Rule 2.3(A) is *actual* bias or prejudice.

Notwithstanding the plain meaning of the rule, we see two arguments that Rule 2.3(A) might prohibit not just actual bias, but also exhibitions of apparent bias. First, comment [2] to Rule 2.3, CJC, provides in part that "[a] judge must avoid conduct that may reasonably be perceived as prejudiced or biased," suggesting that apparent, not just actual, bias is prohibited. But when viewed in the context of the comment as a whole, which discusses "[e]xamples of manifestations of bias or prejudice," it appears that these concerns implicate the prohibition in Rule 2.3(B), not that in Rule 2.3(A).

Likewise, Minnesota appellate decisions provide that a "judge should not try a case, even in the absence of bias, if circumstances have arisen which give a bona fide appearance of bias." *Olson v. Olson*, 392 N.W.2d 338, 341 (Minn. App. 1986); *see Wiedemann v. Wiedemann*, 36 N.W.2d 810, 812 (Minn. 1949) ("A litigant, though mistaken in fact, may conceivably assert with sincerity that he has good reason to believe, and does believe, that a judge is biased, and when he so believes his cause should be heard before another judge, if for no other reason than that confidence in the impartial administration of justice is essential to the preservation of any democratic government."). But the question here is not whether recusal by Judge Dehen would have been appropriate because he might reasonably have been perceived to be biased: although Rule 2.11, CJC, requires a judge to disqualify

45

himself "in any proceeding in which the judge's impartiality might reasonably be questioned," the Board did not allege, and the panel did not find, a violation of that rule with respect to the at-risk juvenile guardianship proceedings. The issue here is whether Judge Dehen should be disciplined for failing to "perform the duties of judicial office . . . without bias or prejudice" under Rule 2.3(A), CJC.

We conclude that the requirement in Rule 2.3(A) that a judge "perform the duties of judicial office . . . without bias or prejudice" applies only when a judge's performance of their duties is affected by *actual* bias or prejudice. Our opinion does not preclude a finding, in an appropriate case, that a judge has violated Rule 2.3(B) or 2.3(C) by engaging in conduct that gives the appearance of bias or prejudice, or by allowing an attorney to do so in proceedings before the court. Nor does it limit the circumstances in which a judge should remove themselves, or be removed, if circumstances have arisen which give rise to a bona fide appearance of bias.

In determining whether actual bias or prejudice has affected a judge's performance of their duties in violation of Rule 2.3(A), CJC, we take instruction from decisions assessing bias in other contexts, including decisions assessing whether alleged bias by the judge requires reversal of a criminal conviction, *see, e.g.*, *Liteky v. United States*, 510 U.S. 540, 555 (1994); whether a juror expressed actual bias, *see, e.g.*, *State v. Fraga*, 864 N.W.2d 615, 623 (Minn. 2015); and whether recusal or removal of a judge is appropriate. *See, e.g.*, *State v. Burrell*, 743 N.W.2d 596, 603 (Minn. 2008). But we also note that none of those contexts precisely match the situation here, where we are asked to

46

determine whether a judge's adverse rulings were the product of bias or prejudice that merits judicial discipline.

Accordingly, we set forth the following principles for assessing actual bias and prejudice under Rule 2.3(A), CJC. We typically presume that judges will set aside any biases or prejudices that they might have, and that adverse rulings, being presumed to be based on the judge's good faith view of the law, will by themselves almost never suffice to prove actual bias. But when the evidence shows that a judge has such a high degree of favoritism or antagonism as to make fair judgment impossible or nearly so, that evidence will support a conclusion that the judge's adverse rulings were affected by bias or prejudice meriting judicial discipline.[24]

### B.

We consider these principles regarding judicial bias as we next turn to Judge Dehen's conduct related to the at-risk juvenile guardianship proceedings. The root of the panel's conclusions is that Judge Dehen violated the Code of Judicial Conduct, specifically

---

[24] As with the "legal errors test" described above, Judge Dehen argues that the panel's failure to "apply the actual bias test" precludes a finding that he violated Rule 2.3(A). We reject this argument. As with other allegations of misconduct, the relevant standard of review is that the court independently assesses whether the Board has proven that a judge violated a provision of the Code of Judicial Conduct, deferring to the panel's findings of fact unless they are clearly erroneous.

Rules 1.1,[25] 1.2,[26] 2.2,[27] 2.3(A),[28] and 2.5,[29] by basing his decisions not on the relevant statute, but on his prejudice and/or bias "against the law and non-citizen juveniles seeking immigration benefits." The panel concluded that Judge Dehen violated these rules "by failing to follow the statutory requirements for a juvenile to qualify for at-risk guardianship." Neither the panel nor the parties has cited to any prior decisions, in Minnesota or elsewhere, that shed light on the meaning of these rules of judicial conduct. But we have discussed above, both in Part I and in this Part, principles relevant to our decision.

The panel's conclusion that Judge Dehen failed to follow the statutory requirements under chapter 257D is based largely on Judge Dehen's judicial actions: statements made or questions asked in open court, statements in orders regarding the facts or the law, and decisions on the merits of the at-risk juvenile guardianship petitions. Accordingly, the legal errors test we discussed in Part I informs our decision whether Judge Dehen's actions

---

[25]   *See* Rule 1.1, CJC ("A judge shall comply with the law, including the Code of Judicial Conduct.").

[26]   *See* Rule 1.2, CJC ("A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.").

[27]   *See* Rule 2.2, CJC ("A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially.").

[28]   *See* Rule 2.3(A), CJC ("A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice.").

[29]   *See* Rule 2.5, CJC (as relevant here, providing that a "judge shall perform judicial and administrative duties competently and diligently.").

amount to misconduct: any legal errors Judge Dehen made are not misconduct unless they were made contrary to clear and determined law *and* the error was egregious, made in bad faith, or otherwise part of a pattern or practice of legal error. *See* Rule 4(c), RBJS. "Bad faith" includes actual bias. And to the extent Judge Dehen is alleged to have committed misconduct by making his decisions based on actual bias or prejudice, our discussion above regarding how to assess judicial bias for purposes of Rule 2.3(A), CJC, is controlling. After carefully considering both the facts found by the panel and the legal principles we have discussed above, we conclude that the Board did not demonstrate, by clear and convincing evidence, that Judge Dehen committed misconduct in his actions related to the at-risk juvenile guardianship proceedings.

The panel's findings that Judge Dehen refused to follow the relevant law (Minnesota Statutes chapter 257D and relevant federal law) rest, almost entirely, on the proposition that the relevant law is clear. From this proposition, the panel reasons that Judge Dehen asked clearly irrelevant questions; that he based his determinations on factors that are clearly irrelevant to the law; and that he otherwise refused to correctly apply the law, despite its clear commands. The panel therefore seems to have reasoned that given this clarity, the only explanation for Judge Dehen's actions was bias against disfavored groups and/or disagreement with the purposes of Minnesota Statutes chapter 257D and immigration in general.

49

We disagree.[30]  The statute requires a judge considering an at-risk juvenile guardianship petition to make two findings regarding "the best interests of the at-risk juvenile."  Specifically, for the district court to establish a guardianship under chapter 257D, it must conclude that "the guardianship is in the best interests of the at-risk juvenile," Minn. Stat. § 257D.08, subd. 1(2), and that "it is not in the best interests of the at-risk juvenile to be returned to" a previous country or residence, Minn. Stat. § 257D.08, subd. 1(5).  The statute does not specify how the "best interests of the at-risk juvenile" are to be determined; it states only that " '[b]est interests' has the meaning given in section 260C.511, paragraph (a)," Minn. Stat. § 257D.01, subd. 5.  And that statute in turn provides that the "best interests of the child"[31] "means all relevant factors to be considered and evaluated."  Minn. Stat. § 260C.511(a) (2024).

In addition, to establish a guardianship under chapter 257D, the district court must conclude that "the proposed guardian is *capable and reputable*," Minn. Stat. § 257D.08, subd. 1(1) (emphasis added), and that "reunification . . . with one or both parents is *not viable* because of abandonment, neglect, or a similar basis . . . ."  *Id.*, subd. 1(4).  None of

---

[30]  Neither Judge Dehen, the Board, nor the panel has presented substantial argument regarding the construction of the statute, except that the panel concluded that the statute's requirements are "clear" and "determined," and the Board generally agrees.  Our discussion of Minnesota Statutes chapter 257D below is not intended to be a definitive construction of the statute.  Instead, it is an assessment of the panel's legal conclusion that the statute is clear, as viewed from the perspective of a district court judge in Judge Dehen's position at the time he made his rulings in these matters.

[31]  Because at-risk juveniles who may petition for guardianship under Chapter 257D are by definition between the ages of 18 and 21, *see* Minn. Stat. § 257D.01, subd. 4, they are not technically "children."  *See* Minn. Stat. § 260C.007, subd. 4 (defining "child" as an individual under 18 years of age or in foster care).

the italicized terms are defined in the statute. Thus the statute requires the district court to make four factual findings based on terms that are not defined in the statute, and which could be viewed as allowing the district court judge to consider a wide range of factors.[32]

Moreover, Judge Dehen acted, with respect to the at-risk juvenile guardianship petitions, without the benefit of substantial appellate authority construing the statute. Indeed, nearly all of his actions were taken without the benefit of *any* such authority. At the time Judge Dehen decided the first of the at-risk juvenile guardianship petitions in early 2023, the statute was less than a year old, and there was no appellate authority addressing it. The first substantive appellate decision construing the statute, *Corpeno*, was issued on January 29, 2024, after Judge Dehen had already made adverse decisions on three of the matters at issue (the petitions of Corpeno, Ayala, and X.V.L.) and held hearings on the fourth and fifth matters (the petitions of A.M.A. and J.C.L.). Of the complained-of conduct in the at-risk guardianship matters, only Judge Dehen's order denying J.C.L.'s petition, on February 12, 2024, followed the court of appeals' decision in *Corpeno*. And although the decision in *Corpeno* reversed Judge Dehen's decision on that petition, that decision did not address what factors are relevant in considering "best interests," except to state that "the district court inquired about potential collateral consequences," and that the decision "was required to be based on the statutory criteria set forth in Chapter 257D, rather than asserted or perceived collateral consequences of the decision." *Corpeno*, 2 N.W.3d at 598 n.2. By

---

[32] The statute also requires the court to make what in most situations seems likely to be a straightforward finding: that "both the petitioner and the proposed guardian agree to the establishment of a guardianship under this chapter." Minn. Stat. § 257D.08, subd. 1(3).

the time the court of appeals issued its decision in *Ayala* on February 20, 2024, *all* of the complained-of conduct had already occurred. Although the order removing Judge Dehen from the A.M.A. matter came after the *Ayala* decision, at the time Judge Dehen was asked to recuse himself from the A.M.A. matter on January 12, 2024, neither the *Corpeno* nor the *Ayala* appellate decisions had been issued.

Furthermore, there is an arguable tension within chapter 257D between its explicit statement of the purposes of a guardianship and the implicit link that it draws with federal immigration law. On the one hand, the statute states that the purpose of a guardianship under chapter 257D "is to provide an at-risk juvenile with guidance, assistance, financial and emotional support, and referrals to resources necessary to either or both . . . meet the at-risk juvenile's needs," or "protect the at-risk juvenile from sex or labor trafficking or domestic or sexual violence." Minn. Stat. § 257D.02. These, not any immigration benefit that might accrue to the at-risk juvenile because of a guardianship, are the *stated* purposes of a guardianship under the text of Chapter 257D.

On the other hand, the definition of "at-risk juvenile" specifically references potential eligibility for classification under section 1101(a)(27)(J) as a "special immigrant." And the findings required for a district court to award a guardianship satisfy nearly all the requirements for classification as a special immigrant under section 1101(a)(27)(J); the only remaining requirement is the consent of the Secretary of Homeland Security under section 1101(a)(27)(J)(iii). Taken together, these two aspects of chapter 257D seem to suggest that an additional—albeit implicit—purpose of chapter 257D is to allow at-risk immigrant youth between 18 and 21 years of age to seek guardianships

that will allow them to attempt to gain immigration protection through the Special Immigrant Juvenile Status (SIJS) classification, available under federal law to certain undocumented immigrants under the age of 21 who have been abused, neglected, or abandoned by one or both parents. *See* 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11 (2025). SIJS is a pathway for those individuals to apply for and obtain legal permanent residence in the United States through the federal immigration system.

Thus it is not surprising that when Judge Dehen asked Corpeno's attorney what the purpose of the proceedings under the statute were, given that Corpeno had reached the age of 18, Corpeno's attorney straightforwardly explained that if Corpeno were designated as an at-risk juvenile, he "would have to apply for his immigration benefit before he turns 21," prompting Judge Dehen to ask, "what's the immigration benefit?" Likewise, when Judge Dehen was questioning Ayala, he asked her what the benefit to her of a guardianship would be; her attorney broke in on the questioning and openly explained that Ayala needed a guardianship for the process of seeking a visa. And when Judge Dehen was questioning X.V.L.'s attorney, he asked what the guardianship was "going to do for her"; X.V.L.'s attorney responded that "there is an advantage in immigration to allow them to reside here legally." But again, at the time Judge Dehen began deciding at-risk juvenile guardianship petitions, there had been no appellate authority resolving this arguable tension within the statute.

We now consider the evidence presented by the panel in support of its conclusion that Judge Dehen was hostile to or biased against the statute, immigration, or immigrants, in light of this assessment of the law at the time he made his decisions. We do so by

53

considering: 1) Judge Dehen's purported rejection of immigration benefits as a basis for a guardianship; 2) Judge Dehen's purportedly irrelevant or inappropriate questions, comments, and findings; 3) the views of Judge Dehen's colleagues; 4) the experience of immigration attorneys; and 5) Judge Dehen's removal from the A.M.A. matter.

1.

The internal tension between the stated purposes of the statute, on the one hand, and the implicit purposes suggested by its link to federal immigration law, on the other, potentially explains what the panel (and the Board) seems to have viewed as the strongest evidence of Judge Dehen's alleged bias. The panel stressed that "[i]n two of his decisions"—namely, the decisions in the X.V.L. and J.C.L. matters—"Judge Dehen specifically rejected immigration benefits as an appropriate reason to seek an at-risk juvenile guardianship, notwithstanding that the state statute specifically refers to at-risk juveniles applying for special immigration status under the federal law." The Board also argues that these decisions reflect bias or hostility to immigration.

The panel's findings about the specific text of the statute, and about Judge Dehen's rulings, are clearly erroneous. First, it is not true that the state statute "specifically refers to at-risk juveniles applying for special immigration status." Although chapter 257D does define "at-risk juvenile" as a "person potentially eligible for classification under" a particular provision of federal immigration law, nothing in the state statute, or even the referenced federal statute, specifically refers to an immigrant's application. Indeed, the text of chapter 257D never refers directly to immigrants, immigrant status, or an immigrant's application for status under federal law.

54

Likewise, Judge Dehen did not "specifically reject[] immigration benefits as an appropriate reason to seek an at-risk juvenile guardianship." Instead, in the X.V.L. matter, he noted that the purposes of a guardianship under chapter 257D, as stated in Minn. Stat. § 257D.02, are to provide support and resources for the at-risk juvenile to meet their needs, and/or to protect the at-risk juvenile from trafficking or violence, and that "[i]mmigration status is not specifically listed here, and does not naturally follow from" either of those statutory purposes. Likewise, Judge Dehen wrote that X.V.L.'s attorney "stated that [X.V.L.] is seeking the guardianship for immigration benefits, which is not enumerated in that section of Minnesota law." Judge Dehen's statements were not contrary to clear and determined law.[33]

To be sure, we do not mean to suggest that Judge Dehen was correct in his apparent conclusion that the statute *precludes* granting a guardianship that is sought for immigration

---

[33] Judge Dehen also wrote that an immigration benefit "is not aligned with the purposes of guardianship as enumerated in Minn. Stat. § 257D.02." The Board argues that this statement "is impossible to reconcile with the plain language of the at-risk guardianship statute, which was enacted to do exactly what Judge Dehen rejected—provide a potential immigration benefit to at-risk juveniles—and which specifically references the federal law concerning the immigration benefits of the guardianship." The Board may well be right about the *reason the Legislature enacted* the statute. Indeed, our discussion in the main text regarding the statute's links to 8 U.S.C. § 1101(a)(27)(J) supports that view. But no evidence regarding the Legislature's purpose is in the record, and it appears from a review of the transcripts and other evidence in the record that no one ever attempted to demonstrate to Judge Dehen that the Legislature's purpose in enacting chapter 257D was to provide immigration benefits. And in any event, the Board is wrong about the "plain language of the statute," and specifically section 257D.02: there can be no doubt that, as Judge Dehen wrote, an immigration benefit is *not* one of the "purposes of guardianship *as enumerated in Minn. Stat. § 257D.02*." (Emphasis added.)

55

benefits, if the statutory factors under Minn. Stat. § 257D.08, subd. 1, are otherwise met. It is not our task today to definitively interpret chapter 257D.

The panel's conclusions of misconduct are not based on a purported interpretive error of that sort, however. Instead, they are based in large part on the proposition that Judge Dehen willfully refused to follow the supposedly clear language of the statute. That proposition is not supported by the record: the statute's language did not clearly compel the result that the panel claims, and no appellate decision had definitively construed the statute when Judge Dehen was making his decisions.

Likewise, Judge Dehen's order with respect to J.C.L. did not "reject[] immigration benefits as an appropriate reason to seek an at-risk juvenile guardianship." At the time that Judge Dehen issued the order in the J.C.L. matter, he had just been instructed by the court of appeals in its *Corpeno* opinion that a decision on an at-risk juvenile guardianship petition "was required to be based on the statutory criteria set forth in Chapter 257D, rather than asserted or perceived collateral consequences of the decision." *See Corpeno*, 2 N.W.3d 595 at 598 n.2. The transcript of the panel proceedings indicates that both Judge Dehen and the Board interpreted "collateral consequences" in the *Corpeno* decision to include immigration benefits. So instructed, Judge Dehen wrote in his order that J.C.L.'s attorney "stated that Petitioner is seeking the guardianship for immigration benefits, which is not enumerated in [Minn. Stat. § 257D.02], and therefore cannot be considered by the Court."

In short, the language in Judge Dehen's orders regarding the purposes of the at-risk juvenile guardianship statute with respect to X.V.L. and J.C.L. are consistent with an attempt to apply the language of the statute and, in the case of J.C.L., to reconcile it with

the court of appeals' guidance in *Corpeno*.[34]  Neither the panel nor the Board has identified any authority that supports the proposition that his reasoning in those matters was clearly wrong at the time he decided them.  We conclude that Judge Dehen's reasoning in these matters regarding the purposes of the at-risk juvenile guardianship statute does not demonstrate bias.

2.

The panel also noted numerous questions, comments, or findings that Judge Dehen made that either are not obviously relevant to the findings he was required to make in the at-risk juvenile guardianship proceedings, or have since been found on appeal to be irrelevant.  We do not address every such instance here.  As X.V.L.'s attorney testified, "judges need to ask questions to better understand the matters before them."  Likewise, the court of appeals observed in its *Corpeno* decision, in discussing Judge Dehen's wide-ranging questioning, that "we do not fault the district court for seeking to understand the broader context of this new statute."  2 N.W.3d at 598 n.2.  We agree.  That was especially so here, where the findings that Judge Dehen was statutorily required to make— whether a proposed guardian is "capable and reputable," whether a guardianship is in the "best interests" of the at-risk juvenile, whether reunification with one or both parents was "not viable," and whether it is not in the "best interests" of the at-risk juvenile to return to

---

[34]  Ironically, both the panel and the Board find fault with Judge Dehen for allegedly ignoring the prohibition against considering collateral consequences in the J.C.L. order, when in fact he specifically relied on it.

57

their previous country or residence—were so open-ended under the statute and where the statute gives mixed messages about the purpose of a guardianship.

To be sure, some of Judge Dehen's questions are not readily explainable as part of an effort to determine any of the statutory factors, even given the somewhat open-ended inquiry the statute requires. Notably, Judge Dehen questioned both X.V.L. and Ayala about their immigration status, specifically asking them whether they were in the country "legally or illegally." Before the panel, Judge Dehen testified that he believed—and still believes—that this questioning was relevant because of his belief that if a person is in the country legally, they do not qualify as an at-risk juvenile under the statute. But he has never been able to provide any persuasive authority for this proposition. Likewise, Judge Dehen questioned the proposed guardian in the X.V.L. matter about his immigration status and his ability to speak English; he eventually concluded based on the proposed guardian's "illegal" status and inability to speak English that the proposed guardian was not "capable and reputable," as is required for a finding under Minn. Stat. § 257D.08, subd. 1(1). Judge Dehen's explanations for the reasons he asked these questions were effectively called into question by the Board's cross-examination in proceedings before the panel. In short, some of Judge Dehen's questions and findings were irrelevant, potentially offensive, and of dubious propriety. We do not endorse every question that Judge Dehen posed, and we encourage district court judges to think carefully before asking questions that may be perceived as exhibiting bias. But we do not view these questions and findings, viewed in light of the whole record, as establishing actual bias by clear and convincing evidence.

Our opinion should not be construed as approval of Judge Dehen's reasoning with respect to any of the findings in the unappealed orders in the X.V.L. and J.C.L. matters, or as disapproval of any aspect of the court of appeals' decisions in *Corpeno* and *Ayala*, particularly that Judge Dehen made clearly erroneous factual findings. Those issues are not before us. Nor should this opinion be construed to call into question the Chief Judge's removal of Judge Dehen in the A.M.A. matter. We simply conclude that the errors in Judge Dehen's orders were not contrary to clear and determined law, and that they are arguably consistent with a good-faith effort to apply the law as he understood it.

3.

The panel also based its conclusion that Judge Dehen refused to follow the law on the fact that his colleagues on the Tenth District juvenile assignment disagreed with him about aspects of chapter 257D. The panel concluded that "even after being told by his judicial colleagues that a juvenile's immigration status was not to be considered when deciding if he or she qualified as an at-risk juvenile, Judge Dehen did not alter his position." Likewise, in concluding that Judge Dehen's conduct reflected bias rather than mere error, the panel relied in part on "the view he voiced to his colleagues that the law should not be used to assist at-risk juveniles in seeking immigration benefits."

We have no reason to doubt the testimony of Judge Dehen's colleagues, which they presented by affidavit. But the fact that Judge Dehen did not agree with his district court colleagues about the proper interpretation of chapter 257D does not demonstrate that he willfully refused to follow the law and instead made his decisions based on improper bias or prejudice. Judges have views about the proper interpretation of the law. Their views

59

may differ from those of their colleagues. As discussed above, chapter 257D was new, and at the time Judge Dehen had these discussions with his colleagues, there was little to no appellate authority about how to interpret it. That the court of appeals eventually reversed Judge Dehen on appeal does not indicate that he was willfully refusing to apply the "correct" interpretation of the law, nor that it was misconduct for him to interpret the law differently from his colleagues.

To be sure, when a judge finds that they disagree with all of their colleagues about a particular issue, it may be wise for that judge to consider whether their colleagues are correct. But it is not misconduct for a judge to conclude that their own interpretation is correct, in the absence of controlling precedent to the contrary. To hold that it is misconduct for a judge to disagree with their colleagues on an undetermined issue of law would chill judicial independence and damage the functioning of the Judicial Branch. Judges are answerable for their decisions to the appellate process and ultimately to the electorate. In the absence of clear and settled law, they should not be answerable for their decisions as judicial misconduct as well. *See* Rule 4(c), RBJS.

4.

The panel also relied in part on the fact that Judge Dehen denied at-risk juvenile guardianship petitions filed by experienced immigration practitioners who testified that they had successfully brought many such petitions and never previously had a petition denied. We also observe from their testimony that several of the attorneys who appeared before Judge Dehen indicated that his approach to the guardianship matters was atypical

60

compared to other judges, referencing unusual "pushback" or that other judges before whom they had appeared asked few if any questions.

That Judge Dehen approached these matters differently than other judges does not demonstrate bias or an intention to disregard the law. Different judges have different styles. And to the extent that Judge Dehen may have asked more questions than other judges, we see nothing in the statute that precluded him from doing so. In short, the possibility that Judge Dehen may have taken a different and more probing approach to these matters is not inconsistent with a good-faith effort to correctly apply the law.

5.

As addressed above, the Chief Judge of the Tenth Judicial District granted A.M.A.'s motion to remove Judge Dehen from her case, concluding that the facts of that case, along with certain findings in the Ayala and X.V.L. matters, "would cause a reasonable examiner to question Judge Dehen's impartiality and to question whether his bias against what he[] perceives to be illegal immigration impairs his ability to determine w[he]ther the proposed ward [sic] is an at-risk juvenile." The panel noted the Chief Judge's finding, apparently reasoning that it supported the conclusion that Judge Dehen was biased. But the removal motion employs a different standard than our inquiry in this proceeding. A judge is disqualified if "a reasonable examiner, with full knowledge of the facts and circumstances, would question the judge's impartiality." *In re Jacobs*, 802 N.W.2d 748, 753 (Minn. 2011). In other words, disqualification may occur based on the *appearance* of bias. But here, the question is whether Judge Dehen's decisions were based on actual bias. Because the Chief Judge's removal of Judge Dehen from the A.M.A. matter was based on a more limited

61

record than the one before us, and because it was based on a different standard than we apply, it does not affect our inquiry regarding whether Judge Dehen committed judicial misconduct.

*     *     *

In summary, we conclude that the Board did not prove by clear and convincing evidence that Judge Dehen violated the Code of Judicial Conduct by his actions in the at-risk juvenile guardianship proceedings. Any legal errors Judge Dehen made, including errors in determining what information might be relevant to the findings he was required to make under chapter 257D, were not contrary to clear and determined law. Specifically, we disagree with the panel that the proper interpretation of chapter 257D, including what factors were relevant to the required findings under that statute, was clear and determined. We therefore disagree with the panel that Judge Dehen's rulings and other actions—which go to what was *not* clear and determined under chapter 257D—convincingly reflect actual bias or intentional disregard for the law.

IV.

We now come to the third type of judicial misconduct found by the panel, namely that Judge Dehen violated the Code of Judicial Conduct by conducting court proceedings from a moving car to travel to a swim meet in which a family member was competing. The panel concluded that Judge Dehen's actions violated Rules 2.1, 2.4, and 2.8 of the Code of Judicial Conduct.

In proceedings before the panel, Judge Dehen did not dispute that he committed misconduct. He acknowledged that conducting court proceedings from a car was a "bad

62

idea" and left some of the participants in the proceedings feeling that it was inappropriate and unprofessional. And in his final argument to the panel, his attorney admitted that his behavior amounted to misconduct. But in his brief to this court, Judge Dehen argues that his actions were "not ethical misconduct." He does not challenge the panel's factual findings, but he argues that virtual courts are generally more casual than in-person appearances, and that conducting a remote calendar from his car would be preferable to "either canceling the calendar with less than one day's notice or finding a replacement judicial officer."

Rule 2.1, CJC, requires that a judge's duties "take precedence over all of [their] personal and extrajudicial activities." Rule 2.4, CJC, requires that a judge "not permit family, social, . . . or other interests or relationships to influence the judge's judicial conduct." And Rule 2.8, CJC, states that a judge shall "require order and decorum in proceedings before the court." Based on the panel's factual findings, which Judge Dehen does not challenge, and based on his admissions before the panel, we conclude that the Board proved by clear and convincing evidence that Judge Dehen violated these provisions of the Judicial Code. Absent extraordinary circumstances, conducting court from a moving car is not consistent with decorum in proceedings before the court. And Judge Dehen's reasons for compromising judicial decorum were based on his failure to place his judicial duties ahead of his personal and family activities. Although this is less serious than the other misconduct we have concluded Judge Dehen committed, we nevertheless conclude that conducting a remote calendar from a moving car in order to be able to travel to attend a family function is judicial misconduct.

V.

Having concluded that Judge Dehen has committed judicial misconduct, we turn to the question of sanctions. In determining the appropriate sanction, we are "guided by the principle that the purpose of judicial discipline is not to punish, but 'to protect the public by insuring the integrity of the judicial system.' " *In re Ginsberg*, 690 N.W.2d 539, 548 (Minn. 2004) (quoting *In re Miera*, 426 N.W.2d 850, 858 (Minn. 1988)). Accordingly, the sanction imposed "must be designed to announce our recognition that misconduct has occurred, and our resolve that similar conduct by this or other judges will not be condoned in the future." *Miera*, 426 N.W.2d at 858. We act "not to punish the wrongdoer but to restore public confidence in the system and its officers." *Id.* We "independently review the record to determine the discipline, if any, to impose" and do not defer to the panel or Board's recommended sanctions. *In re Karasov*, 805 N.W.2d 255, 275 (Minn. 2011); *In re Blakely*, 772 N.W.2d 516, 523 (Minn. 2009).

Here, we have concluded that Judge Dehen committed misconduct with respect to the court reporter compensation dispute and by conducting remote hearings from a car. Of these two types of misconduct, the court reporter compensation dispute is the far more serious: Judge Dehen abused the power of his judicial office by attempting to leverage that power to resolve a professional dispute. Although we recognize that Judge Dehen had a good-faith belief that his court reporter was being treated unfairly, the method Judge Dehen chose to attempt to resolve that dispute—acting as the judge in his own dispute by twice signing and issuing a writ of mandamus purporting to require the district court administrator to pay his court reporter at a particular rate, and denying her a meaningful

64

opportunity to respond—was clearly wrong. His actions needlessly consumed resources in multiple aspects of the court system: he subjected the district court administrator to unnecessary litigation, required the attorney general to seek two separate writs of prohibition in the court of appeals, and required the court of appeals to decide those matters. His actions also led to the court reporter, for whose benefit Judge Dehen was ostensibly acting, to be out of work for roughly two months without any compensation. And his actions undermined public confidence in the integrity and impartiality of the judiciary. His misconduct with respect to conducting remote hearings from a car, along with his prior history of judicial discipline, enhance the seriousness of his misconduct.

The panel recommended that Judge Dehen be suspended without pay for six months, based on its findings that Judge Dehen committed misconduct, not just in the matters that we have found constituted misconduct, but also in the at-risk juvenile guardianship matters. Judge Dehen argues that he committed no misconduct and therefore no discipline is warranted; if the court does impose discipline, he suggests that the appropriate discipline is a public reprimand. The Board contends that the sanction for Judge Dehen's misconduct—again, in all three matters—should be at least as great as the panel recommended. But in addition to censure and suspension without pay for six months, the Board also argues that he should be subject to a civil penalty under Rule 11(b)(2)(vi), RBJS, and possibly removed from office.[35]

---

[35] Judge Dehen argues that because the Board chose not to appeal the panel's decision or recommendations, it is inappropriate for the Board now to argue for a more severe sanction than the panel recommended. Judge Dehen's position finds support in our rules:

We have never previously disciplined a judge for misconduct similar to Judge Dehen's misconduct in this matter. We begin with the suggestion that we should consider removal. We have removed only four judges from office. In *In re Pendleton*, 870 N.W.2d 367, 370 (Minn. 2015), we removed Judge Pendleton for misconduct that included living outside of his judicial district, in violation of the Minnesota Constitution, and making a knowingly false statement regarding his residency in an affidavit for candidacy for judicial office. We determined that removal was appropriate, in part because we had recently suspended a judge for six months based on their failure to live in their judicial district, and Judge Pendleton was aware of this, but he deliberately chose to live outside of his judicial district for an even longer time than the previous judge, *id.* at 387–88, thereby "flout[ing] a discipline decision of our court." *Id.* at 388. Another case, *In re Ginsberg*, 690 N.W.2d 539 (Minn. 2004), involved significant misconduct including "actions taken in or directly related to Judge Ginsberg's role as a judge," as well as "two incidents of criminal conduct he committed outside that role." *Id.* at 549. In one of the criminal incidents, Judge Ginsberg assaulted a 14–year–old boy and accused him of stealing a bicycle from the judge's son. *Id.* at 547. When the boy denied involvement and threatened to call the police, Judge Ginsberg invoked his judicial position and threatened to have the boy charged with a crime. *Id.* In *In re Winton*, 350 N.W.2d 337, 338–39 (Minn. 1984), the record established

"A party's failure to timely appeal a panel's findings, conclusions, and/or recommendation for discipline constitutes acceptance thereof." Rule 11(d), RBJS. But we have authority to direct "such discipline or other action as [we] conclude[] is just and proper." Rule 14(e), RBJS. Accordingly, the Board's decision not to appeal the panel's decision or recommendations does not limit our consideration of a more severe sanction.

66

that Judge Winton had engaged in an extensive course of misconduct that involved soliciting and engaging in prostitution with "young men," including at least one under the age of 18, and that he had pleaded guilty to two counts of misdemeanor prostitution. And in *In re Gillard*, 271 N.W.2d 785, 802–05 (Minn. 1978), we removed a judge who had been involved in numerous incidents of grave professional misconduct—including severe neglect of lawsuits, dishonesty in communications with clients, and failure to disclose conflicts of interest—that the judge committed as an attorney before he was appointed to the bench. That misconduct was serious enough that we also disbarred Judge Gillard as a lawyer. *Id.* at 805. Although Judge Dehen's misconduct is very serious, we do not think it rises to the level of misconduct in those matters.

As to judicial suspensions, in *In re Blakely*, 772 N.W.2d 516, 527 (Minn. 2009), we imposed a public censure and a six-month suspension on a judge who negotiated and obtained a substantial legal fee reduction from his personal attorney while appointing the attorney to provide mediation or related services in matters pending before him. And in *In re Miera*, 426 N.W.2d 850, 859 (Minn. 1988), we imposed a public censure and a one-year suspension on a judge who made sexual advances to a court reporter, including nonconsensually kissing the court reporter on the lips in the courtroom; touched the clothing of another court employee in the breast area; made sexual innuendo to other court employees; and made intemperate remarks about his judicial colleagues.

After careful review of the entire record, we conclude that Judge Dehen's actions warrant censure and suspension of judicial duties for nine months without pay. That this suspension is longer than the panel recommended, despite our conclusion that Judge Dehen

67

committed less misconduct than the panel found, reflects the egregiousness of Judge Dehen's actions in the court reporter compensation dispute. Judge Dehen's conduct in that dispute severely undermines the public's trust in the judicial system, giving the impression that a judge may treat their office as a weapon to be used in professional disputes. More specifically, he repeatedly abused his position of authority, wielding his power differential over district court staff and other employees like a cudgel; all the while disregarding a clear conflict of interest, and twice orchestrating a judicial process that provided the district court administrator no real opportunity to respond. And even after the court of appeals dismissed his first writ of mandamus, Judge Dehen doubled down, repackaged it—creating his own "facts" of which he took judicial notice—and submitted a second writ of mandamus. His actions wasted precious judicial resources and disrespected the rule of law and the administration of justice that he took an oath to uphold. And by introducing the tools of litigation into what was essentially a human-resources issue, Judge Dehen also damaged the professional functioning of the Judicial Branch.

Finally, Judge Dehen has exhibited little if any remorse for his flagrant and egregious actions involving the court reporter dispute, and thus we must fulfill our obligation to ensure that the misconduct is not repeated again, and to deter others from similar behavior. Under these circumstances, we conclude that a suspension of nine months is appropriate. Moreover, in order to ensure that the sanction we impose will be effective, and consistent with our decision in *Blakely*, if Judge Dehen ceases to be a judge

before his term of judicial suspension ends,[36] then he will be suspended from the practice of law for a term equal to the balance of his judicial suspension.[37]

VI.

Under Rule 14(f), RBJS, when the panel recommends the suspension or removal of a judge, the court provides the Office of Lawyers Professional Responsibility an opportunity to be heard on the issue of lawyer discipline. Considering lawyer discipline in the context of a judicial discipline proceeding "is appropriate both for purposes of judicial economy and to avoid the imposition of additional stress and costs of a separate lawyer discipline proceeding on the respondent judge/lawyer." *In re Ginsberg*, 690 N.W.2d at 555.

---

[36] On September 17, 2025, the Board submitted a letter to the court stating that it had been advised that on September 10, 2025, Judge Dehen submitted a notice of retirement to the governor, effective October 10, 2025. As part of the Board's letter, the Board also argues that "[g]iven the seriousness of Judge Dehen's misconduct, his disciplinary history, and the actual harm to individuals and the public, immediate removal is warranted." On September 19, 2025, Judge Dehen submitted a response to the Board's letter, opposing the Board's argument. For reasons already addressed in our opinion, we have concluded that censure and suspension, rather than removal, is the appropriate discipline.

[37] A suspension for judicial misconduct does not generally require that the judge petition for reinstatement. *See* Rule 11(b), RBJS. Instead, the Rules of Board on Judicial Standards only address the need to petition for reinstatement after a disability suspension, which is not at issue here. *See* Rule 16(g), RBJS. In contrast, for attorney discipline, any lawyer suspended for more than 90 days must petition for reinstatement, unless that requirement is specifically waived by this court. Rule 18, Rules on Lawyers Professional Responsibility. Because the discipline we impose here is based upon Judge Dehen's judicial misconduct, consistent with the Rules of Board on Judicial Standards, we clarify that no petition for reinstatement is required, including if—as indicated by the parties' letters—Judge Dehen ceases to be a judge before his term of judicial suspension ends.

Here, the Director filed a brief arguing that each of the violations of the Code of Judicial Conduct found by the panel also implicates the requirement in Minnesota Rules of Professional Conduct that a lawyer not engage in "conduct that is prejudicial to the administration of justice." *See* Minn. R. Prof. Conduct 8.4(d). She argues that the court should impose a six-month suspension, with the suspension running concurrently with any judicial suspension imposed. In response, Judge Dehen argues that because there are "no comparable actions a lawyer can take that mirror the[] judicial acts" that we have determined were misconduct, he should not be subject to discipline as a lawyer. And he argues that there is no evidence that he violated Minn. R. Prof. Conduct 8.4(d), which he denigrates as "a catch-all and fail-safe, meant to salvage an argument for discipline when no concrete or substantive rules have been violated, but there is an esoteric need or motive for making an example of someone."

We disagree with Judge Dehen's characterization of Rule 8.4(d), and the effect of his judicial acts on the appropriate lawyer discipline. We have previously recognized that misconduct committed by a judge may be subject to attorney discipline under Rule 8.4(d). *See Blakely*, 772 N.W.2d at 528 (negotiating and obtaining fee reduction from personal attorney while contemporaneously appointing the attorney to provide mediation or related services violated Rule 8.4(d)). It is true that Judge Dehen's misconduct in this matter is not similar to the type of conduct for which this court typically disciplines practicing lawyers. But as we have described, his conduct wasted judicial resources, disrupted court administration, and compromised courtroom decorum, all of which is prejudicial to the administration of justice, and is therefore attorney misconduct under Rule 8.4(d). We

70

conclude that Judge Dehen's actions with respect to the court reporter salary dispute, and with respect to the remote hearing conducted in his car, violated Rule 8.4(d).

We disagree, however, with the Director's suggestion that Judge Dehen should be concurrently and independently suspended as an attorney during the period of his judicial suspension. As we have previously noted when considering lawyer discipline in a judicial discipline proceeding, "the lawyer discipline issue must receive independent consideration." *Ginsberg*, 690 N.W.2d at 555. We have also noted that "the standard of conduct imposed on an individual as a judge is higher than the standard imposed on lawyers," *id.*, which suggests that when considering the same misconduct as both judicial misconduct and attorney misconduct, a lesser sanction may be appropriate for the attorney misconduct than for the judicial misconduct. Moreover, as we noted in *Blakely*, a judge may not practice law. 772 N.W.2d at 528 n.8; *see* Rule 3.10, CJC. Accordingly, suspension of Judge Dehen's license to practice law is essentially irrelevant so long as Judge Dehen remains a judge. Under the circumstances of this case, we conclude that the appropriate *attorney* discipline is a public reprimand. But as already explained, in order to ensure that the *judicial* sanction we impose will be effective, and consistent with our decision in *Blakely*, if Judge Dehen ceases to be a judge before his term of judicial suspension ends, then he will be suspended from the practice of law for a term equal to the balance of his judicial suspension.

**CONCLUSION**

For the foregoing reasons, we order that:

1.     Judge John P. Dehen is hereby censured for judicial misconduct and suspended from judicial office, without pay, for nine months, effective seven days from the date of the filing of this decision.  If Judge Dehen ceases to be a judge before his term of judicial suspension ends, then he will be suspended from the practice of law for a term equal to the balance of his judicial suspension.

2.     Judge Dehen is hereby publicly reprimanded as an attorney.

GAÏTAS, J., took no part in the consideration or decision of this case.